(No. 56629.

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. RAYMOND LEE STEWART, Appellant.

*Opinion filed October 19, 1984.—Rehearing denied February 1, 1985.*

SIMON, J., concurring in part and dissenting in part.

Randy E. Blue, Deputy Defender, and Daniel M. Kirwan and David M. Raymond, Assistant Defenders, of the Office of the State Appellate Defender, of Mount Vernon, for appellant.

Neil F. Hartigan, Attorney General, of Springfield, and Daniel D. Doyle, State's Attorney, of Rockford (Mark L. Rotert and Kenneth A. Fedinets, Assistant Attorneys General, of Chicago, of counsel), for the People.

JUSTICE WARD delivered the opinion of the court:

The defendant, Raymond Lee Stewart, was indicted in the circuit court of Winnebago County, for the murder of Kevin Kaiser, a Rockford gas station attendant. The first count alleged that the defendant committed murder with intent to kill or do great bodily harm to the victim. (Ill. Rev. Stat. 1981, ch. 38, par. 9—1(a)(1).) The second count alleged that the murder was committed during the course of the defendant's armed robbery of Kaiser at the gas station. (Ill. Rev. Stat. 1981, ch. 38, par. 9—1(a)(3).) Following a jury trial, he was convicted of murder on both counts. A hearing in aggravation and mitigation was had before the same jury, and the defendant was sentenced to death. The defendant appealed directly to this court pursuant to our Rule 603 (87 Ill. 2d R. 603).

The evidence showed that on the morning of January 28, 1981, the defendant shot Kevin Kaiser four or five times in the course of an armed robbery, killing him. The defendant does not challenge the sufficiency of the evidence to show that he killed Kaiser. A witness testified having seen a man who closely resembled the defendant at the scene of the murder. The witness identified a tan, three-quarter-length coat recovered from the defendant's Buick automobile as the one worn by the man he had seen at the gas station. Human blood stains and gunshot primer residue were found on both sleeves of the coat. The defendant admitted at trial that he had been staying, under a fictitious name, at a Rockford motel at the time of the murder. There was unchallenged testimony by a ballistics expert that Kaiser was killed by bullets fired from the gun later found in the defendant's suitcase. The defendant admitted that he had purchased the gun in July of 1980 but said that he had sold the gun a month later to Jimmy Jones, who lived in Rockford. He testified that he has bought the gun back from Jones on February 3, 1981.

A witness, however, who lived in Rockford for 14 years on the block where the defendant said Jones lived testified that he had never heard of Jimmy Jones. The defendant testified that he had not purchased any .38-caliber ammunition in December 1980, but a prosecution witness said that he had sold .38-caliber Smith & Wesson Special ammunition to the defendant on December 5, 1980.

The defendant's fingerprint was found on the door in the gas station where Kaiser was killed. The door had been washed the day before his murder.

Six days after Kaiser's murder the defendant rented a U-Haul trailer in Rockford and attached it to a black and maroon Mercury automobile with Wisconsin license No. SC—4801. The rental contract showed that the

trailer was to be rented for one day. On February 6, 1981, the Mercury had broken down in De Kalb, and it, with the U-Haul trailer attached, was towed to a house in Sycamore. (It was later established that the defendant's brother-in-law lived in the house.) Within two days the trailer had been taken away as well as a red-and-white Buick that had been parked in the driveway. Later that month, the defendant arrived at the Greensboro, North Carolina, home of Florence Crosby, his first cousin, driving a red-and-white Buick with a U-Haul trailer attached.

On February 21, 1981, the defendant was arrested outside Crosby's apartment building as he was about to enter the Buick. The arresting officers had a Federal arrest warrant for unlawful flight to avoid prosecution. The basis for the Federal charge was that the defendant had fled from Illinois to avoid prosecution for an armed robbery committed by him in Rockford on November 24, 1980. Following the arrest, Leonard Bogaty, a special agent of the Federal Bureau of Investigation, had a conversation with Crosby and following that went to a bedroom of the apartment where he gathered and took items of property belonging to the defendant. The items, including a radio scanner and a large brown suitcase, were brought to the Greensboro police station. A warrant to search the property taken from the apartment was obtained from a United States magistrate later that day. Bogaty found a loaded .38-caliber revolver in a black leather holster inside the suitcase. A search was also made of the Buick under the same warrant. Special Agent Henry Phillip of the Federal Bureau of Investigation found in it, among other items, a three-quarter-length, tan coat and a copy of the U-Haul trailer-rental contract.

The next day Bogaty went to the residence of Charlie Benton, the defendant's uncle, in Whitsett, North

Carolina, which is a short distance from Greensboro. Benton stated that a U-Haul trailer which was sitting in the front yard was placed there by the defendant. The trailer was towed to the Greensboro police station and was searched after a warrant had been obtained. Among the property found in the trailer was a box of .38-caliber ammunition, a plastic ammunition carrier, and the defendant's driver's license.

The defendant first contends that the circuit court erred in denying his pretrial motion to suppress the evidence seized under the authority of the two search warrants. He contends that the affidavits attached to the complaints for the warrants were insufficient to establish probable cause to believe that the items sought under the warrants would be found in the places to be searched.

The complaint for a warrant to search the defendant's Buick and luggage was supported by the affidavit of Special Agent Henry M. Phillips of the Federal Bureau of Investigation. The affidavit related that the defendant was suspected of committing six (*sic*) homicides (actually seven homicides as later detailed in the affidavit) during the course of four armed robberies over a seven-day period in early 1981; that witnesses had identified the defendant as having been in the areas where the offenses were committed and that his Mercury automobile was seen at the site of one of the incidents; that the bullets removed from the six victims were fired from the same weapon and were either .38-caliber, .357-caliber, or 9-mm projectiles; that a Realistic police scanner and a multi-band scanner had been stolen during one of the armed robberies; that the defendant had fled from Illinois and had gone to North Carolina in a red-and-white Buick; that the defendant had been arrested at and his vehicle was located at an address described as Benton's home in Greensboro (ac-

tually Crosby's home); that a search of the home was conducted with consent and that a Realistic police scanner was found among the defendant's property in a bedroom; and that the defendant fit descriptions provided by witnesses of a suspect in the vicinity of the armed robberies. The complaint for a warrant to search the U-Haul trailer was supported by the affidavit of Special Agent Thomas J. Brereton of the Federal Bureau of Investigation and incorporated the Phillips affidavit by reference. The Brereton affidavit provided the following additional information: that the defendant rented a U-Haul trailer on February 4, 1981, in Rockford; that a relative of the defendant observed the trailer being towed by a Buick driven by the defendant in Greensboro; that Benton stated that the defendant left the trailer at his residence in Woodset (*sic*) and that he, Benton, had observed the defendant's personal property inside the trailer; that the return of the trailer to the U-Haul Corporation was 16 days overdue; and that Benton authorized the Federal Bureau of Investigation to take possession of the trailer. A copy of the U-Haul rental contract was also attached to the Brereton affidavit.

In *People v. Gacy* (1984), 103 Ill. 2d 1, 21, we said:

> "In reviewing the sufficiency of the complaint [for a search warrant] we are guided by the Supreme Court's statement in *Spinelli v. United States* (1969), 393 U.S. 410, 21 L. Ed. 2d 637, 89 S. Ct. 584, 'that only the probability, and not a prima facie showing, of criminal activity is the standard of probable cause, *Beck v. Ohio* [(1964), 379 U.S. 89, 96, 13 L. Ed. 2d 142, 147-48, 85 S. Ct. 223, 228]; that affidavits of probable cause are tested by much less rigorous standards than those governing the admissibility of evidence at trial, *McCray v. Illinois* [(1967), 386 U.S. 300, 311, 18 L. Ed. 2d 62, 70, 87 S. Ct. 1056, 1062]; that in judging probable cause issuing magistrates are not to be confined by niggardly

limitations or by restrictions on the use of their common sense, *United States v. Ventresca* [(1965), 380 U.S. 102, 108, 13 L. Ed. 2d 684, 688, 85 S. Ct. 741, 745]; and that their determination of probable cause should be paid great deference by reviewing courts, *Jones v. United States* [(1960), 362 U.S. 257, 270-71, 4 L. Ed. 2d 697, 708, 80 S. Ct. 725,735-36].' (393 U.S. 410, 419, 21 L. Ed. 2d 637, 645, 89 S. Ct. 584, 590-91.)"

A showing of probable cause means that the facts and circumstances within the knowledge of the affiant are sufficient to warrant a person of reasonable caution to believe that an offense has occurred and that evidence of it is at the place to be searched. (*People v. Free* (1983), 94 Ill. 2d 378, 400; *People v. Francisco* (1970), 44 Ill. 2d 373, 376.) It is not contended that there was insufficient evidence to believe that several offenses had been committed. Instead the defendant argues that it was unreasonable to believe that evidence of the crimes would be found 800 miles from the scenes of the incidents and at least 19 days after their commission. Since he had disposed of the Mercury automobile, he says, it is illogical and offends common sense to assume that he would not have disposed of other evidence of the offenses as well. We must reject this argument.

First, the somewhat abstract argument is not impressive. Responding abstractly, we cannot say that a reasonable person would readily ascribe common sense and logical reasoning to one who engaged in a bizarre crime spree as the defendant evidently did. Too, even if a person such as the defendant would have disposed of instruments, such as a car, employed in the commission of the offenses, it is not unreasonable to assume that he would not be as ready to dispose of the property for which he, according to the affidavit, may have killed seven people. As the affidavits stated, the defendant had with him a radio scanner similar to one stolen during one of the armed

robberies. (Although the radio scanner had not been positively identified as the one that was stolen, it is not required that a complaint or affidavit for a search warrant show beyond a reasonable doubt that the warrant should be issued. (*People v. Free* (1983), 94 Ill. 2d 378, 400.) A reasonable person might readily assume that a radio scanner found among the defendant's property was the one stolen during one of the armed robberies.) Too, and importantly to this contention, the affiants were aware that the reason that the defendant had abandoned his Mercury automobile was because it was not in an operable condition. "Whether or not probable cause exists in a particular case depends upon the totality of the circumstances and facts known to the officers and court when the warrant is applied for." (*People v. Free* (1983), 94 Ill. 2d 378, 400.) Even if one assumes a want of particularity in the affidavits, the agents' reasonable and good-faith belief, although a possibly mistaken one, that the searches were authorized under the warrants, insulated the searches from a motion to suppress. *United States v. Leon* (1984), 468 U.S. ___, 82 L. Ed. 2d 677, 104 S. Ct. 3405; *United States v. Beck* (11th Cir. 1984), 729 F.2d 1329.

"Although in a particular case it may not be easy to determine when an affidavit demonstrates the existence of probable cause, the resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants." (*United States v. Ventresca* (1965), 380 U.S. 102, 109, 13 L. Ed. 2d 684, 689, 85 S. Ct. 741, 746.) Read in a common-sense and realistic fashion, the affidavits contained sufficient specificity in light of the totality of the circumstances to justify the issuance of the search warrants. There was a substantial basis for the magistrate's finding of probable cause. (*Massachusetts v. Upton* (1984), 466 U.S. ___, 80 L. Ed. 2d 721, 104 S. Ct. 2085.) We consider that the trial court's denial of the defendant's motion to suppress

was not manifestly erroneous. See *People v. Garcia* (1983), 97 Ill. 2d 58, 74; *People v. Free* (1983), 94 Ill. 2d 378, 401.

The defendant relies principally upon *United States v. Bailey* (9th Cir. 1972), 458 F.2d 408, in arguing that a search far removed in time and distance from the scene of an offense must be more closely scrutinized. The court in *Bailey* granted a motion to suppress evidence of searches conducted six weeks after the bank robbery concerned and more than 100 miles away from the bank. But the factual circumstances in *Bailey* are different from those here. In *Bailey*, there was no indication that the defendant owned the car that was searched or that he had been seen in it before his arrest. Moreover, the police knew that the car had no connection with the robbery because Bailey's codefendant admitted that she had borrowed the car from a friend about a month after the robbery. The court also suppressed evidence gathered from a search of a house at which the defendants had been seen once, but there was no indication that they were more than casual social guests. The decision in *Bailey* is in contrast to the same court's holding in *Porter v. United States* (9th Cir. 1964), 335 F.2d 602. There the court refused to suppress evidence taken in a search of the defendant's auto six weeks after the commission of the offense. The affidavit supporting the warrant was held to be sufficient because, *inter alia,* it disclosed that the automobile was owned by the defendant, that the evidence sought was not on the defendant's person when he was arrested, and because the auto had an out-of-State license plate. The identification of the defendant as the owner of the auto was said to be evidence of great importance. For these reasons, the court said, and because the defendant had not yet settled in the community, the most likely place to look for the evidence sought was inside his car. Similar to *Porter* and in contrast with *Bai-*

*ley,* the Federal Bureau of Investigation here knew that the Buick was owned by the defendant and that he had been seen in it prior to his arrest. The car had a verified connection with the robberies and homicides; it was, too, the vehicle used to commit the Federal offense for which he was arrested, *viz.* unlawful flight to North Carolina. The defendant had apparently made at least his temporary residence in his relative's home. (The defendant testified at trial that one reason he had returned to Rockford from North Carolina in January 1981 was "to receive all of my belongings that I was going to take to North Carolina to move there and stay there.") Certainly he was more than a "casual social guest." Because he had brought his belongings from Illinois to North Carolina and because he was not carrying evidence of the offenses on him when arrested, it was not unreasonable to conclude that there was a fair probability that the evidence sought would be found in the car, in the U-Haul trailer, or in his luggage.

The defendant also claims that, even if the search warrants were properly issued, the trial court should have granted the defendant's motion to suppress the evidence seized from Florence Crosby's apartment because, he alleges, it was obtained without consent during a warrantless entry. The Phillips' affidavit stated that the defendant "was residing at 600-C Banner Street, the residence of CHARLIE BENTON, and they [*sic*] executed a waiver form and advised and showed officers the location of STEWART'S property." At the suppression hearing, Benton testified that he had never lived at 600-C Banner Street and that he was not at that address on the date of the arrest. Florence Crosby, also called by the defendant to testify, stated that she lived in the apartment in front of which the defendant was arrested. Their testimony, the defendant asserts, constituted a *prima facie* showing that the search of Crosby's home was made

without consent.

Section 114—12(b) of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1981, ch. 38, par. 114—12(b)) imposes on the defendant the burden of proving that the search and seizure were unlawful. (See also *People v. Berg* (1977), 67 Ill. 2d 65.) The defendant has not made this showing. The testimony of the defendant's witnesses at the suppression hearing merely showed that the Phillips' affidavit was erroneous as to who lived at 600-C Banner Street. This is immaterial as to the question of whether the search of the apartment was consensual. Florence Crosby was not asked whether she consented to the search of her apartment. Phillips' statement, in his affidavit, that agents had obtained consent to search Crosby's apartment was not effectively rebutted.

We would observe, too, that in reviewing the denial of a motion to suppress, a reviewing court is free to look to trial testimony as well as the evidence presented at the hearing on the motion to suppress. (*People v. Caballero* (1984), 102 Ill. 2d 23; *People v. Conner* (1979), 78 Ill. 2d 525, 532; *People v. Braden* (1966), 34 Ill. 2d 516, 520.) That one may conclude that Crosby did consent to the search of her apartment is apparent from the record. Leonard Bogaty, one of the agents of the Federal Bureau of Investigation who made the defendant's arrest, testified:

"Q. After Mr. Stewart was taken from the scene by the officers, what did you do?

A. I went to the apartment.

Q. And when you got to the apartment door what did you do?

A. I had a conversation with Florence Crosby.

Q. And after your conversation with Florence Crosby where did you go or what did you do?

A. I went to a bedroom in that apartment and gathered Mr. Stewart's person [*sic*] belongings that he had in that bedroom."

One thus can infer that it was Crosby who consented to the search of her home. Bogaty's statement was unrebutted. (Parenthetically, we would observe that the State made a motion to supplement the record on appeal with a copy of a consent form signed by Florence Crosby authorizing Bogaty to search her apartment on February 21, 1981. The defendant objected to the motion. Because of our disposition of the consent issue above, we need not consider here the State's motion to supplement.) The trial court's refusal to suppress the evidence seized from Crosby's apartment was not manifestly erroneous; we must uphold that ruling. See *People v. Williams* (1974), 57 Ill. 2d 239, 246.

The defendant next contends that the prosecution's exclusion by peremptory challenges of five veniremen who expressed conscientious or religious scruples against the death penalty resulted in an unconstitutionally selected jury. Its five peremptory challenges, the defendant says, produced a jury from which the prosection had swept all who expressed scruples against capital punishment and which was "uncommonly willing to condemn a man to die" in violation of *Witherspoon v. Illinois* (1968), 391 U.S. 510, 20 L. Ed. 2d 776, 88 S. Ct. 1770. The defendant also cites *Swain v. Alabama* (1965), 380 U.S. 202, 13 L. Ed. 2d 759, 85 S. Ct. 824, generally, as a basis for challenging the prosecution's use of peremptory challenges.

The defendant did not object to the peremptory challenges during *voir dire*. Nor did he raise the present claim in any of his post-trial motions. Thus, the issue has been waived. (See *People v. Roberts* (1979), 75 Ill. 2d 1, 10.) The defendant, however, argues that his counsel's failure to preserve the alleged error is evidence of ineffective assistance of counsel. We must disagree. Ineffective assistance of counsel is not shown by a failure to preserve for review an issue which previously has been

decided adversely to the claim of error. (*People v. Lewis* (1981), 88 Ill. 2d 129, 156.) It is clear that the prosecution did not have to show cause for or explain the exercise of its peremptory challenges. (*People v. Davis* (1983), 95 Ill. 2d 1.) Thus, the defendant's trial counsel did not have to make what would have been a fruitless objection.

In *Dobbert v. State* (Fla. 1982), 409 So. 2d 1053, the Supreme Court of Florida considered a contention similar to the one the defendant now makes. The defendant there, as here, relied on *Witherspoon* and *Swain*. After first holding that peremptory challenges may be exercised freely and without explanation or justification, the court went on to say that in any event the defendant had waived any right to challenge the jury by his failure to object to the State's peremptory challenges. In a later proceeding (*Dobbert v. Strickland* (M.D. Fla. 1982), 532 F. Supp. 545), the district court, in denying *habeas corpus* relief, agreed that the defendant had waived the issue and held also that the defendant would not be entitled to relief even if the principle of waiver were not applied. The court said: "*Witherspoon* is clearly inapplicable to the case at bar *** [*Swain*] cannot, even by analogy, be considered controlling here." (532 F. Supp. 545, 561-62.) Similarly, in *Jordan v. Watkins* (5th Cir. 1982), 681 F.2d 1067, the court held that *Witherspoon* is inapposite to [a similar peremptory-challenge argument] because it applies solely to the use of challenges for cause. We concur with those evaluations. (See also *Jones v. State* (1979), 243 Ga. 820, 256 S.E.2d 907; *Cf. Adams v. Texas* (1980), 448 U.S. 38, 48, 65 L. Ed. 2d 581, 592, 100 S. Ct. 2521, 2528 (court cited peremptory challenges as example of permissible exclusions having nothing to do with capital punishment).) There is no evidence that the resulting jury here was biased in favor of a death sentence. (See *People v. Tiller* (1982), 94 Ill. 2d 303, 322.) One may note that "[j]ust because the jurors were not opposed to the death

penalty does not mean that they were biased in favor of it." *People v. Ramirez* (1983), 98 Ill. 2d 439, 460.

In *Witherspoon v. Illinois* (1968), 391 U.S. 510, 20 L. Ed. 2d 776, 88 S. Ct. 1770, the Supreme Court held that prospective jurors could not be excused for cause simply because they had scruples against capital punishment. The defendant here contends that venireman Cynthia M. Lochen was improperly excused for cause in violation of *Witherspoon.* During the *voir dire* examination there was the following discussion:

"THE COURT: Mrs. Lochen, do you have any conscientious or religious scruples against the infliction of the Death Penalty?

JUROR LOCHEN: I'm against it.

THE COURT: Would you automatically vote against the Death Penalty regardless of the facts that were presented during these proceedings?

JUROR LOCHEN: No, not automatically but I just don't believe in it. I would have to know the reasons. I mean I don't know what kind of, you know, murder this was, what the reason is or anything.

THE COURT: Would you automatically vote for the Death Penalty regardless of the facts presented?

JUROR LOCHEN: Probably not.

THE COURT: When I said that if such a hearing was called for at the end of this case that the jury would be required to consider all of the arguments and reasons for the imposition of the Death Penalty and would also have to consider all of the arguments and reasons against the imposition of the Death Penalty and would then have to vote to determine whether to impose the Death Penalty, if you were selected to serve on this jury would you consider all of the reasons and arguments and evidence both for and against the Death Penalty before making up your mind on that issue?

JUROR LOCHEN: No.

THE COURT: Why would you not do so?

JUROR LOCHEN: I just don't believe in it. I just don't believe in the Death Penalty.

THE COURT: Would you say that do [*sic*] have then conscientious scruples against the infliction of the Death Penalty?

MR. KOSKI [prosecutor]: I move she be excused for cause.

MR. PUMILIA [defense counsel]: I object to that, your Honor. We would like the opportunity to question.

THE COURT: I will permit you both to inquire of this juror.

\* \* \*

MR. KOSKI: Miss Lochen, you have stated you're against the Death Penalty and you have stated that a couple of times in response to questions by the Judge. Are you against it to such a degree you would be unable to vote in favor of it?

JUROR LOCHEN: Yes.

MR. KOSKI: As a matter of your scruples or beliefs; is that how you feel?

JUROR LOCHEN: Yes.

MR. KOSKI: And you feel you would be unable to vote in favor of the Death Penalty regardless of the circumstances that might be presented to you in this or any other case?

JUROR LOCHEN: Yes.

MR. KOSKI: I believe that you said in response to one of the Judge's questions that you could consider the Death Penalty; did you say that?

JUROR LOCHEN: Yes, I did at first but as he questioned me more I thought more about it and I just feel that I would be responsible giving somebody a sentence to death and I wouldn't want it on my mind.

MR. KOSKI: I would ask she be excused for cause.

MR. PUMILIA: Your Honor, we object and we ask the opportunity to question the juror.

THE COURT: You may inquire of the juror.

MR. PUMILIA: At this point?

THE COURT: Of that juror on that subject?

MR. PUMILIA: Thank you. Miss Lochen, the question is not how you are going to vote right now, the question in front of you is would you be able to listen to

the instructions of law that the Judge would give you? Would you listen to them?

THE JUROR: Yeah, I would listen.

MR. PUMILIA: And would you consider them, think about them before you made your decision? I am just asking that you consider or think about—we are not asking what you would do just will you consider, will you think about—

JUROR LOCHEN: Well, I am really against, you know, the Death Penalty. I would listen.

MR. PUMILIA: Yeah, I appreciate your position. The duty of a juror is to be able to think and to consider the questions of fact and to be able to consider the law, think about the law the Judge has given you and that's what I'm asking you be able to do is consider, just think about the law that the Judge would instruct you on; would you be able to do that?

JUROR LOCHEN: I probably wouldn't consider it.

THE COURT: I think we will close the inquiry of this juror and the Court will excuse her for cause.

MR. PUMILIA: I had another question or two.

THE COURT: You may ask one more question.

MR. PUMILIA: Would there be any circumstances such as an individual who killed a thousand children under those circumstances would you be able to consider the Death Penalty?

MR. KOSKI: Objection, I think to postulate something like that is to speculate, your Honor, and it is not related to this case.

THE COURT: Let me hear the juror's answer.

JUROR LOCHEN: Yeah, I might consider it."

Following this questioning, the venireman was excused for cause. When the defendant objected, the court again asked Lochen whether she would follow the court's instructions concerning the imposition of the death penalty. She flatly responded, "No."

The defendant again contends that Lochen's responses did not demonstrate unequivocal opposition to the death penalty. We consider that they did within the meaning of

*Witherspoon*. Looking to the whole of Lochen's response, one concludes that she had a fixed opposition to capital punishment under *Witherspoon*. "*Witherspoon* does not prescribe a set catechism or require 'a venireman to express himself with meticulous preciseness.'" (*People v. Kubat* (1983), 94 Ill. 2d 437, 499, quoting from *People v. Gaines* (1981), 88 Ill. 2d 342, 356.) The trial court, which is in a superior position to evaluate a venireman's response (see *People v. Silagy* (1984), 101 Ill. 2d 147; *People v. Gaines* (1981), 88 Ill. 2d 342), came, we believe, to the correct conclusion. A venireman's isolated statement that he or she might or would consider the death penalty need not be accepted by the trial court when the balance of the answers made is to the contrary.

The defendant suggests that Lochen should have been informed of the facts of the case, that is, the evidence to be presented. The *voir dire* examination, however, is not designed or required to afford an advanced trial, so to speak, to determine whether prospective jurors will apply the law to the facts of the case without bias or prejudice. This determination can be made without an advance presentation of the facts involved.

To support his contention the defendant also points to Lochen's answer that she might consider the death penalty for a person who killed a thousand children. Such an unrealistic and unreasonable hypothesis does not provide a standard for determining whether *Witherspoon* was satisfied. The question was whether Lochen would seriously consider the charges here. Not only did her responses reveal that she would not consider the death penalty in this case, but they disclosed that, although she would listen to the court's instructions, she would not follow them. This in itself warrants excusal for cause. See *Adams v. Texas* (1980), 448 U.S. 38, 65 L. Ed. 2d 581, 100 S. Ct. 2521; *People v. Free* (1983), 94 Ill. 2d 378, 402.

The evidence shows that the defendant was advised of

his rights under *Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602, at the police station. He agreed to talk to the officers present and signed a waiver-of-rights form. The defendant first denied having been in the Rockford area during the previous two months, denied owning a maroon Mercury, and denied having been involved in a homicide. He later admitted ownership of the Mercury and having been with his girlfriend, Estena Brooks, at the birth of their child. (The baby had been born in a Rockford hospital on January 24, 1981.) When the officers pointed out that he must have been in Rockford within the last two months if he was at the birth of his child, the defendant said that he meant that he had been with his girlfriend during an earlier, unspecified hospitalization. He then said that he no longer desired to speak with the officers and tore up the waiver-of-rights form.

The defendant testified at trial that he had been living in Rockford prior to December 12, 1980. On that date he heard that he was wanted by the police for an armed robbery and he fled to Crosby's home in Greensboro. He returned to Rockford on January 22, 1981, to see Brooks and the baby when born and to pick up his belongings. His testimony was that he spent January 28, 1981, the day of Kaiser's murder, at the Brooks household in South Beloit with Estena, her mother, and the baby. On cross-examination, he admitted buying late in July 1980 the gun which was later used to kill Kaiser. He testified that he sold the gun the following month to James Jones, who lived in a brown two-floor house on the west side of the 500 block of Springfield Street in Rockford. He said that he bought the gun back from Jones on February 3, 1981. He also stated that he did not buy any .38-caliber ammunition in December 1980.

Lawrence Thrower, who had resided for 14 years on the east 500 block of Springfield Street, identified from

photographs each house on the block and its occupant. He further testified that he had never heard of Jimmy Jones. Douglas Olson, an employee of the Southern Wisconsin Sports Center in Beloit, Wisconsin, testified that his business records showed that he sold a box of .38-caliber Smith & Wesson Special ammunition to the defendant on December 5, 1980.

The defendant now argues that his fifth amendment right to remain silent was violated when the prosecutor elicited testimony at trial that the defendant had torn up the waiver-of-rights form, when the prosecutor cross-examined the defendant concerning why he had not presented his exculpatory version of events prior to trial, and when the prosecutor commented during closing argument on the defendant's "late story" concerning how he had obtained the gun. The defendant, however, did not object to the points at trial and did not raise the issues in his post-trial motion. The questions have been waived. (*People v. Gacy* (1984), 103 Ill. 2d 1, 98; *People v. Jackson* (1981), 84 Ill. 2d 350, 358-59.) The defendant, invoking the doctrine of plain error, would have us consider the questions. (See 73 Ill. 2d R. 615(a).) The doctrine, however, is to be invoked where the evidence is closely balanced or where the error was of such magnitude that the accused was denied a fair trial. (*People v. Lucas* (1981), 88 Ill. 2d 245, 251.) We do not consider the evidence here to be closely balanced. Nor do we judge that the prosecutor's inquiries or comment, improper or not, affected the jury's verdict. (See *People v. Miller* (1983), 96 Ill. 2d 385.) The evidence against the defendant was formidable and highly persuasive. Too, we believe that the prosecution effectively impeached the defendant's exculpatory testimony by introducing evidence that the defendant had lied in claiming that he bought the gun used to kill Kaiser after the murder and in denying the purchase of ammunition.

The defendant, citing *People v. Dascola* (1926), 322 Ill. 473, and *People v. Fiorita* (1930), 339 Ill. 78, next contends that he was denied a fair trial by his cross-examination on irrelevant and prejudicial matters. He complains of questioning that concerned his relationship with Victoria Cobb and the reason why he had phoned her from North Carolina to ask if he could stay with her when he returned to Rockford on January 22, 1981. The defendant asserts that the prosecutor was improperly attempting to sully the defendant's character. A reading of the complete cross-examination, however, indicates that the prosecutor was attempting to establish that the defendant had stayed in a motel in Rockford because he was avoiding the police who had a warrant for his arrest. The prosecutor was evidently attempting to impeach the defendant's earlier testimony that he stayed in the motel because he was hoping that Estena Brooks would stay with him. If that were true, the prosecutor wondered, why did the defendant ask Cobb if he could stay with her? The explanation that the defendant later gave for phoning Cobb was that while he knew that she would not let him stay with her, he was charging his long distance calls to her account and did not want her to think that he was not thinking of her. We cannot say that the trial court abused discretion in permitting the questioning.

The defendant also contends that the prosecutor improperly tried to show the jury that the defendant had only little affection and interest in his newborn child. The defendant was cross-examined concerning not telling his cousin, with whom he was staying in North Carolina in December of 1980, about the baby. The cousin, Florence Crosby, had previously testified that the defendant had not mentioned anything about a baby before he left for Illinois. The questioning complained of was part of a line of questioning by the prosecution intended to reveal the defendant's motives for returning to Rockford. Defense

counsel objected twice during this line of questioning—once on the grounds that the question called for a conclusion and once because the question went to the memory of another and not to the memory of the witness. Both objections were sustained. The defendant cannot complain when objections were sustained by raising now a different ground of objection.

The defendant complains of the questioning concerning his reasons for not bringing the baby and Estena Brooks home from the hospital. Reading the record shows that, instead of trying to depict the defendant as someone who was unfeeling toward his baby and its mother, the prosecution was trying to show that a reason of the defendant's for not taking the baby home was that he was afraid that the police would be able to locate him from the hospital's discharge records.

In summary, we cannot say the trial court abused discretion as to the defendant's cross-examination. The record discloses that there were valid motives for the complained-of questioning. "It is proper on cross-examination to develop all circumstances within the knowledge of the witness which explain, qualify, discredit or destroy his direct testimony although they may incidentally constitute new matter which aids the cross-examiner's case." *People v. Williams* (1977), 66 Ill. 2d 478, 486, quoting Gard, Illinois Evidence Manual R. 471 (1963).

Donald Bottomley, a Rockford police officer, was called as a witness by the defendant. He testified that he observed a man between the gas pumps at the service station where Kaiser worked. This was at a time later estimated to be the time of Kaiser's death. He observed the subject for only five or six seconds, but he was able to provide this description:

> "Distinctly it was a black male with faded green and almost brown coat maybe two-thirds length. He had a protruding moustache and I would say maybe five foot

eight or five foot ten but between the pumps you have a place where there is three or four inches above the pavement and he was approximately I would say one hundred sixty pounds or something like that."

The defendant's appearance is similar to that of the person Bottomley described. On cross-examination, there was this colloquy:

"Q. Sir, is the person you saw in the station that morning present in the courtroom today?

A. I'm not one hundred percent positive. I couldn't positively identify him. Approximately basically the features are the same but I can't positively say.

Q. Who bears the same features and same description?

A. This subject [the defendant] right here, the protruding moustache—"

Following cross-examination, defense counsel announced in the judge's chambers that he was surprised by Bottomley's testimony and asked to examine the witness as if under cross-examination. The prosecutor objected and stated that earlier he had warned defense counsel that Bottomley might identify the defendant from the stand.

The defendant contends that his trial counsel gave ineffective assistance in calling the only witness, Bottomley, who placed him at the scene of the crime. The People, however, contend, correctly, we believe, that calling Bottomley to the stand was a matter of what appeared to be reasonable trial tactics. Earlier under hypnosis, Bottomley had given a much different description of the man at the scene of the crime. It appears that defense counsel mistakenly believed that Bottomley had given two contradictory descriptions of the man that he had seen. The record indicates, however, that the description Bottomley gave under hypnosis was his recollection of the description given by another witness on the date of the crime; it was not his own description. The description he testified to at trial was his own description. Effective assistance of

counsel refers to competent, not perfect representation. (*People v. Puente* (1984), 125 Ill. App. 3d 152.) Mistakes in trial strategy or tactics or in judgment do not of themselves render the representation incompetent. (*People v. Murphy* (1978), 72 Ill. 2d 421, 437; *People v. Torres* (1973), 54 Ill. 2d 384, 392.) Moreover, representation will be considered constitutionally deficient only if the defendant shows that incompetence of counsel produced substantial prejudice, without which the result of trial would probably have been different. (*Strickland v. Washington* (1984), 466 U.S. ___, 80 L. Ed. 2d 674, 104 S. Ct. 2052; *People v. Royse* (1983), 99 Ill. 2d 163, 168; *People v. Greer* (1980), 79 Ill. 2d 103, 120-21.) The People presented a strong case against the defendant, the defendant's alibi was unimpressive, and his explanation as to how he had obtained the gun found in his luggage was shown to be incredible. It cannot be said that the result of the trial would have been different had Bottomley not been called as a witness.

The defendant next argues that the trial court at the sentencing hearing erred in refusing the defendant's tendered instruction 2A, which listed various nonstatutory mitigating factors, *e.g.,* defendant's developmental environment, family situation, age, and mentality. It is true that a defendant's educational and family background, social environment, age, mentality, and general moral character are proper factors for consideration in sentencing. (See *People v. Murphy* (1978), 72 Ill. 2d 421; *People v. Perruquet* (1977), 68 Ill. 2d 149.) As stated in *Lockett v. Ohio* (1978), 438 U.S. 586, 604, 57 L. Ed. 2d 973, 990, 98 S. Ct. 2954, 2964-65, "the Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case, not be precluded from considering, *as a mitigating factor,* any aspect of defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sen-

tence less than death." (Emphasis in original.) But to what extent these factors will be mitigating is properly for the sentencing body's consideration. No error occurred herein refusing the instruction, since the jury did in fact receive an instruction, in accordance with section 9—1(c) of the Criminal Code of 1961 (Ill. Rev. Stat. 1981, ch. 38, par. 9—1(c)), that "mitigating factors may include *** any *** facts or circumstances that provide reasons for imposing less than the death penalty." (See *People v. Free* (1983), 94 Ill. 2d 378, 420.) Thus, the defendant was allowed to, and in fact did, present testimonial evidence at the sentencing hearing concerning each of the factors listed in his offered instruction 2A.

The defendant also contends that the court erred in instructing the jury that during its deliberations on whether to impose the death penalty, "Neither sympathy nor prejudice should influence you. You should not be influenced by any person's race, color, religion, or national ancestry." This is Illinois Pattern Jury Instruction No. 1.01(5) for use in criminal cases. (Illinois Pattern Jury Instruction (IPI), Criminal, No. 1.01(5) (2d ed. 1981).) The defendant, citing *Gregg v. Georgia* (1976), 428 U.S. 153, 49 L. Ed. 2d 859, 96 S. Ct. 2909, suggests that sympathy is a proper consideration for a sentencing jury.

The People correctly point out that this issue was waived by the defendant's failure to object to the instruction at the jury-instruction conference and by failing to raise the issue in any of his post-trial motions. (*People v. Lewis* (1981), 88 Ill. 2d 129, 149; *People v. Underwood* (1978), 72 Ill. 2d 124, 129.) In *Lewis*, the record did not disclose an objection to the questioned instructions. Here, even stronger, the record shows that the defendant's counsel affirmatively declared that "[w]e have no objection to [the proposed instruction]." We will, however, consider the propriety of the instruction because of the defendant's further claim that his trial counsel's failure to

object constituted ineffective assistance of counsel.

In *Gregg,* the Supreme Court rejected a claim by the defendant of an equal-rights violation as in given cases the prosecutor had not asked for the death penalty. The court did not hold that a defendant is entitled to an instruction that sympathy for the defendant should be considered by the jury. Although in some jurisdictions it has been held to be error to give an instruction which would preclude the jury from considering sympathy (*People v. Easley* (1983), 34 Cal. 3d 858, 671 P.2d 813, 196 Cal. Rptr. 309; *State v. Quinlivan* (1972), 81 Wash. 2d 124, 499 P.2d 1268), we consider the view to be preferred is that such an instruction is not improper. (See *State v. Watson* (La. Feb. 27, 1984), 81—KA—2227; *State v. Williams* (1983), 308 N.C. 47, 301 S.E.2d 335; *Rowan v. State* (Ind. 1982), 431 N.E.2d 805; see also *State v. Sully* (1976), 219 Kan. 222, 547 P.2d 344 (court considered it better not to give such instruction, but said that the giving of it would not constitute error).) Several other jurisdictions have not specifically considered this issue, but have not disturbed the giving of a similar instruction. (*Commonwealth v. Travaglia* (1983), 502 Pa. 474, 467 A.2d 288; *People v. Dunoyair* (Colo. 1983), 660 P.2d 890; *Commonwealth v. Benoit* (1983), 389 Mass. 411, 451 N.E.2d 101; *State v. Burgoyne* (Me. 1982), 452 A.2d 393; *Pixley v. State* (Wyo. 1965), 406 P.2d 662.) Here the jury was instructed that it could consider "any other facts or circumstances that provide reasons for imposing less than the death penalty," and the defendant was permitted to present all evidence which he considered mitigating. In closing argument defense counsel twice appealed to the jury's sense of mercy. There was no violation of the right to a fair hearing.

During closing argument at the sentencing hearing, the defense counsel told the jury "you will see in one of the instructions that if you find any mitigating factor

then you [*sic*] may impose a sentence other than the death penalty and the judge would probably impose life without parole." The prosecutor's objection that the statement improperly stated the law was sustained, with the court saying "the sentence other than the death penalty is of no concern to this jury." The defendant admits that the objection was proper since the court would have been required to sentence the defendant to a term of natural life imprisonment without parole if the death penalty was not imposed by the jury. (See Ill. Rev. Stat. 1981, ch. 38, par. 1005—8—1(a)(1)(c).) He argues, however, that by the court's not correcting the misstatement, the prosecutor's objection may have misled the jury to believe that the defendant might one day be eligible for parole.

We have previously stated that in informing the jury of the sentencing alternatives, "[t]he possible terms of parole should not [be] interjected by either counsel." (*People v. Szabo* (1983), 94 Ill. 2d 327, 366.) Any confusion that may have arisen in the jurors' minds concerning the possibility of parole was dispelled when the court correctly informed the jury that it was not to consider the severity of a prison sentence should the death penalty be found to be inappropriate. (See *People v. Albanese* (1984), 102 Ill. 2d 54, 81.) Too, the jury was later instructed that its only duty was to choose whether the death penalty was applicable.

Since the trial court was required to sentence the defendant to life imprisonment without parole if the jury did not return the death penalty verdict (see Ill. Rev. Stat. 1981, ch. 38, par. 1005—8—1(a)(1)(c)), the defendant contends that it was improper for the jury to consider the defendant's potential for rehabilitation. The People, however, point out that the defendant put on witnesses who testified at the sentencing hearing regarding his potential for rehabilitation and that his counsel commented during closing argument on the defendant's rehabilitative

potential and offered jury instructions which contained the defendant's potential for rehabilitation as a mitigating factor. The defendant has thus waived consideration of this issue on appeal. Too, we note that an argument similar to the defendant's was rejected by this court in *People v. Albanese* (1984), 102 Ill. 2d 54, 79. See also *People v. Taylor* (1984), 102 Ill. 2d 201, 205-06.

The defendant argues alternatively that, if his potential for rehabilitation was not an improper consideration for the jury, then three defense witnesses should have been allowed to testify concerning their individual conversations with the defendant which were the bases for their opinions that the defendant could be rehabilitated. William Collins, a Roman Catholic priest, Betty Jo Birkhahn-Rommelfanger, a Methodist minister, and Dr. Karl Hammen, a psychiatrist, each testified that the defendant has potential for rehabilitation. Neither Collins nor Birkhahn-Rommelfanger spent more than 20 minutes with the defendant. They stated that their opinions were based, in part, on the fact that the defendant was studying the Bible in jail. On cross-examination, Dr. Hammen admitted that after examining the defendant in 1973 concerning an earlier offense he then had the same belief that the defendant could be rehabilitated.

The priest, the minister, and the psychiatrist were called as expert witnesses. As experts, they were to exercise their professional judgment in forming opinions relating to the defendant. Testimony as to the specifics of their conversations with the defendant is not relevant either to what their professional opinions were nor how they were formed. The witnesses were permitted to testify to their opinions and how they were formed. The factors determining the admissibility of proffered evidence at a hearing in aggravation and mitigation are relevancy and reliability. (*People v. Davis* (1983), 95 Ill. 2d 1, 43.) We do not consider that the trial court abused discretion

in refusing to allow these witnesses to pass on to the jury what the defendant had told them. (See *People v. Free* (1983), 94 Ill. 2d 378.) An accused should not be permitted to make in this way what would be an unsworn statement to the jury.

The defendant claims that, because the death penalty statute does not require the submission of written findings of fact as the grounds for a sentence of death, the sentencing process in a capital case precludes an adequate appellate review. The defendant argues that in the absence of written findings this court cannot determine whether the sentencing body "engaged in the proper balancing of aggravating and mitigating factors" or whether the jury disregarded certain mitigating evidence. We have previously decided this issue adversely to the defendant's contention. *People v. Kubat* (1983), 94 Ill. 2d 437, 504; *People v. Gaines* (1981), 88 Ill. 2d 342, 383; see also *People v. Caballero* (1984), 102 Ill. 2d 23, 50.

The defendant relies upon *Gardner v. Florida* (1977), 430 U.S. 349, 51 L. Ed. 2d 393, 97 S. Ct. 1197, for support. Because this decision has not been considered by this court we shall discuss it. Contrary to the defendant's assertion, *Gardner* does not stand for the proposition that, without the requirement of written findings, the Florida death penalty procedure would be unconstitutional. The Supreme Court held that a reviewing court must have full access to the complete record on which the sentencing body based its decision to impose the death penalty. In *Gardner,* the trial court sentenced the defendant to death after reviewing a confidential presentence investigative report, which report was not disclosed to the defendant or his counsel and which was not made part of the record on appeal.

The defendant contends that he was denied equal protection of the law since the jury imposed sentence without a presentence report having been prepared and con-

tends, too, that the trial court erred in denying his request to make a statement to the sentencing jury not under oath and not subject to cross-examination. This court has already considered and decided these issues adversely to the defendant's positions. (*People v. Gaines* (1981), 88 Ill. 2d 342.) Too, the defendant admits that these issues were not preserved for review on appeal by objection and post-trial motions. Thus, the issues have been waived. (*People v. Williams* (1983), 97 Ill. 2d 252, 303.) Considering the nature of these questions we cannot say that trial counsel's not making objection is proof of ineffective assistance of trial counsel.

The defendant's arguments that the death penalty statute is unconstitutional in that it does not provide which party has the burden of proof at a hearing in aggravation and mitigation and does not specify what that standard of proof should be have been repeatedly rejected. (*People v. Brownell* (1980), 79 Ill. 2d 508, 533-34; *People v. Free* (1983), 94 Ill. 2d 378, 421; *People v. Caballero* (1984), 102 Ill. 2d 23, 48-49.) In those decisions we harmonized our opinions with the Supreme Court's decisions in *Furman v. Georgia* (1972), 408 U.S. 238, 33 L. Ed. 2d 346, 92 S. Ct. 2726, and *Gregg v. Georgia* (1976), 428 U.S. 153, 49 L. Ed. 2d 859, 96 S. Ct. 2909.

The defendant also claims that the death penalty statute improperly delegates legislative and judicial authority to State's Attorneys, who have been vested with the discretion whether to seek the death penalty in an individual case, and that the statute leads to arbitrary and capricious application of the death penalty in that it fails to guide the exercise of the prosecutor's discretion. The defendant acknowledges that these points were thoroughly discussed by this court and rejected in *People ex rel. Carey v. Cousins* (1979), 77 Ill. 2d 531, and *People v. Lewis* (1981), 88 Ill. 2d 129. The defendant does not offer new argument. The majority's disposition of these issues

in *Cousins* and *Lewis* has recently been affirmed. See *People v. Albanese* (1984), 102 Ill. 2d 54, 82, and *People v. Stewart* (1984), 101 Ill. 2d 470, 495.

The defendant next contends that the death penalty statute violates the eighth and fourteenth amendments to the United States Constitution (U.S. Const., amends. VIII, XIV) in that it does not provide for adequate comparative review of capital cases to determine whether the death penalty is being disproportionately applied. This argument has previously been considered and rejected by this court in *People v. Brownell* (1980), 79 Ill. 2d 508, and *People v. Kubat* (1983), 94 Ill. 2d 437. The defendant, however, contends that proportionality review is constitutionally mandated by *Gregg v. Georgia* (1976), 428 U.S. 153, 49 L. Ed. 2d 859, 96 S. Ct. 2909, and *Proffitt v. Florida* (1976), 428 U.S. 242, 49 L. Ed. 2d 913, 96 S. Ct. 2960. But very recently, in *Pulley v. Harris* (1984), 465 U.S. 37, 79 L. Ed. 2d 29, 104 S. Ct. 871, the Supreme Court held that *Gregg* does not require proportionality review in capital cases and that "[t]here is even less basis for reliance on *Proffitt v. Florida.*" (465 U.S. 37, 46, 79 L. Ed. 2d 29, 37-38, 104 S. Ct. 871, 877.) The court went on to state, "That *Gregg* and *Proffitt* did not establish a constitutional requirement of proportionality review is made clearer by *Jurek v. Texas* [(1976), 428 U.S. 262, 49 L. Ed. 2d 929, 96 S. Ct. 2950]." 465 U.S. 37, 48, 79 L. Ed. 2d 29, 39, 104 S. Ct. 871, 878.

The defendant says that the death penalty statute violates the eighth amendment's (U.S. Const., amend. VIII) prohibition of cruel and unusual punishment in that it arbitrarily and capriciously permits imposition of the death sentence as to English-speaking defendants while exempting non-English-speaking defendants who, under section 104—22 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1981, ch. 38, par. 104—22), require assistance to understand trial proceedings. See Ill. Rev. Stat. 1981,

ch. 38, par. 104—16(b).

Section 104—22 of article 104 of the Code provides, in the part relevant here:

"(a) On motion of the defendant, the State or on the court's own motion, the court shall determine whether special provisions or assistance will render the defendant fit to stand trial as defined in Section 104—10.

(b) Such special provisions or assistance may include but are not limited to:

(1) Appointment of qualified translators who shall simultaneously translate all testimony at trial into language understood by the defendant.

(2) Appointment of experts qualified to assist a defendant who because of a disability is unable to understand the proceedings or communicate with his or her attorney.

\*\*\*." Ill. Rev. Stat. 1981, ch. 38, par. 104—22.

Section 104—26(b) of the same article provides that a defendant who is convicted following a trial under section 104—22 shall not be eligible for the death penalty. See Ill. Rev. Stat. 1981, ch. 38, par. 104—26(b).

The defendant complains that section 104—26(b) unconstitutionally exempts from application of the death penalty those persons who under section 104—22 require special provisions or assistance in order to be fit to stand trial as defined in section 104—10. The latter provision declares that "[a] defendant is unfit if, because of his mental or physical condition, he is unable to understand the nature and purpose of the proceedings against him or to assist in his defense." Ill. Rev. Stat. 1981, ch. 38, par. 104—10.

It should be observed that article 104 (Ill. Rev. Stat. 1981, ch. 38, par. 104—10 *et seq.*) concerns a defendant's fitness for trial, to plead, or to be sentenced, and that it became law in 1979 through the enactment of Senate Bill 133. The General Assembly debates indicate that Senate Bill 133 was introduced because of the bizarre case of

Donald Lang (see *People v. Lang* (1979), 76 Ill. 2d 311), an illiterate deaf mute accused of two murders. Although Lang was not in need of medical treatment, he had "virtually no ability to communicate with other people in any recognized language system." (76 Ill. 2d 311, 316.) Since it could not be said that Lang was under a mental disability, the provisions of the Mental Health and Developmental Disabilities Code (Ill. Rev. Stat., 1978 Supp., ch. 91½, par. 1—100 *et seq.*) which would have provided medical care, shelter, and training were inapplicable. Senate Bill 133, which became article 104, was intended to fill "the glaring gap in the present statutory framework of our criminal justice system as it relates to unfit defendants" (Rep. Lee Daniels, House Debates at 75, June 19, 1979) by rendering the defendant fit to stand trial through assistance or by requiring a hearing to ascertain the defendant's fitness and indicated future treatment for him. The bill provided, *inter alia,* for fitness-for-trial examinations of the accused by a physician, clinical psychologist, psychiatrist, or other expert; detailed, written examination reports and progress reports by the medical expert; periodic hearings to determine fitness; medication; and discharge hearings for persons who cannot be rendered fit to stand trial through special provisions or assistance under section 104—22. These provisions in article 104 clearly are not related to the needs of an accused who simply is non-English-speaking. The problem of defendants who are simply non-English-speaking is met by section 1 of "An Act relating to the appointment of interpreters ***" (Ill. Rev. Stat. 1979, ch. 38, par. 165—11), which provides for interpreters for defendants without an adequate understanding of English.

Clearly the subject of article 104 is fitness for trial. Section 104—10 provides that a person is unfit if because of his mental or physical condition he cannot understand the proceeding and assist in his defense.

There is no indication that "physical or mental condition," as used in section 104—10, was intended by the legislature to include an inability to speak or understand English. The ability or inability to speak or understand English is not mentioned in article 104. Nor is there anything in the debates of the General Assembly to indicate that the legislature considered non-English-speaking defendants to have a mental or physical disability. It surely would be an absurdity to contend, to use an improbable illustration, that the legislature intended that if a foreign legislator, lawyer or professor, were to be convicted of a capital offense, for example, that he could not be considered for the death penalty simply because he did not understand English and required a translator at trial.

Interpreters for defendants who do not understand English had been, and are, provided by statute, as we have noted. (Ill. Rev. Stat. 1979, ch. 38, par. 165—11.) To construe section 104—22 as providing for translators to assist non-English-speaking defendants would unreasonably ignore the existence of section 1.

Considering the obvious purpose and intendment of article 104, it seems clear from the language that section 104—22 is not to be limited to instances of non-English-speaking defendants. It would appear that it would include communication by way of sign language, tactile-sense recognition and similar avenues.

On January 18, 1982, the defendant was convicted of having murdered Willie Fredd and Albert Pearson on January 27, 1981, and he was sentenced to death for those crimes. (People v. Stewart (appeal docketed Mar. 12, 1982), No. 56332.) His appeal from those convictions and sentences is currently in the briefing stage in this court. He contends here that if we were to reverse either conviction on that appeal, *i.e.*, 56332, we would be obliged to vacate the sentence of death that is the subject of this appeal. This is so, he says, because the People in

the prosecution involved here introduced evidence of the defendant's convictions in cause No. 56332 of the murders of Fredd and Pearson as additional aggravating factors at the sentencing hearing following conviction for the murder of Kevin Kaiser.

The contention is a speculative one and should not be a ground for deferring the affirmance of the conviction and sentence here. In light of the possibility the defendant points out, however, we shall not at this time fix a date for the imposition of sentence. When we enter judgment in cause No. 56332 we shall enter an appropriate order in this case regarding the sentence.

For the reasons given, the judgment of the circuit court of Winnebago County is conditionally affirmed, and jurisdiction is retained pending disposition of the appeal in cause No. 56332.[1]

*Judgment conditionally affirmed;*
*jurisdiction retained.*

JUSTICE SIMON, concurring in part and dissenting in

---

[1]On November 30, 1984, the following order was entered in this cause:

On October 19, 1984, we conditionally affirmed the judgment of the circuit court of Winnebago County in this cause. We retained jurisdiction pending disposition of the appeal of defendant Stewart in cause No. 56332. The judgment and sentence of death in that cause have today been affirmed. Accordingly, the judgment in this cause is affirmed without condition, and the execution date of Tuesday, May 28, 1985, which was fixed in cause No. 56332, is fixed as the date for execution of the death sentence in this cause. The defendant shall be executed by lethal injection in the manner provided by section 119—5 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1983, ch. 38, par. 119—5). A copy of this order shall be transmitted by the clerk of this court to the Director of Corrections, to the warden of Stateville Correctional Center, and to the warden of the institution wherein defendant is confined.

part:

I agree that the convictions for murder should be affirmed in this case. However, for the reasons set forth in my separate opinions in *People v. Lewis* (1981), 88 Ill. 2d 129, 179 (Simon, J. dissenting), in *People v. Silagy* (1984), 101 Ill. 2d 147, 184 (Simon, J., concurring in part and dissenting in part), and in *People v. Albanese* (1984), 104 Ill. 2d 504, (Simon, J., concurring in part and dissenting in part), I believe that the Illinois death penalty statute is unconstitutional and that the death sentence should be vacated.