Filed 5/23/08                   NO. 4-06-0223

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from |
| Plaintiff-Appellant, | ) | Circuit Court of |
| v. | ) | Vermilion County |
| JOHNNY R. BRYANT, | ) | No. 04CF759 |
| Defendant-Appellee. | ) | |
| | ) | Honorable |
| | ) | Thomas J. Fahey, |
| | ) | Judge Presiding. |

_____

JUSTICE STEIGMANN delivered the opinion of the court:

In December 2004, the State charged defendant, Johnny R. Bryant, with (1) possession of methamphetamine manufacturing chemicals (720 ILCS 570/401(d-5) (West 2004)) and (2) possession of a controlled substance (more than 15 grams but less than 100 grams of a substance containing methamphetamine) (720 ILCS 570/402(a)(6.5)(A) (West 2004)).  In July 2005, defendant filed a motion to suppress the evidence seized against him, arguing that no probable cause existed to issue a search warrant for his property.  Following an August 2005 hearing, the trial court denied defendant's motion.

In January 2006, the trial court changed its earlier decision and ruled that the search warrant was issued without probable cause.  The court then conducted a good-faith hearing pursuant to United States v. Leon, 468 U.S. 897, 82 L. Ed. 2d 677, 104 S. Ct. 3405 (1984), and held that the good-faith excep-

tion did not apply under the circumstances of this case. Accordingly, the court suppressed the evidence seized pursuant to the execution of the search warrant.

The State appeals, arguing that the trial court erred by determining that (1) the complaint for search warrant was not sufficient to show probable cause for its issuance and (2) the good-faith exception to the exclusionary rule did not apply. Because we agree with both of the State's arguments, we reverse and remand for further proceedings.

## I. BACKGROUND

### A. The Complaint for Search Warrant

In December 2004, the complaint for search warrant in this case was presented to Judge Michael D. Clary. Contrary to the normal practice of presenting the judge with an affidavit setting forth in writing the reasons why probable cause exists for the issuance of the search warrant, the written complaint for search warrant in this case consisted merely of a description of the property to be searched and the items to be seized. The complaint concluded with the following statement: "ORAL TESTIMONY TAKEN." The record also contains a transcript of the sworn testimony of Danville police officer John Thompson given before Judge Clary. Because the first issue before this court is the sufficiency of the information given to Judge Clary to justify his issuance of the search warrant, we set forth Thompson's

- 2 -

testimony in detail:

"Q. [PROSECUTOR:]  Now, from your in-
volvement in this matter do you know who
lives at 51 Bates Drive, Danville, Illinois?

A.  The information we've received was
that a John Bryant lives at the residence.
We have also confirmed this information with
the [p]ost [o]ffice that [Bryant] and Jessica
MeGehee live at the residence, and we also
confirmed through the [w]ater [c]ompany that
the water is turned on in [McGehee's] name.

Q.  Now, at this residence, 51 Bates
Drive, what illegal substances or suspect
activity do you have information on that
causes you to request this search warrant?

A.  We had information in the past that
[Bryant] was selling drugs.  Recently[,] on
the 9th of December, I received a phone call
[at] approximately 6:07 p.m., that Bryant was
going to be cooking meth at the property that
night and was actually in the process of
cooking meth.

Q.  Now, let me stop you there.  Decem-
ber 9th, 2004, at 6:07 p.m.?

- 3 -

A.  Yes, sir.

Q.  Was this person that gave you the information identified or [did he] at least go into some detail about that?

A.  The person was not identified[;] he wished to remain anonymous.  He advised that the trailer was on Bates Drive[;] it was a white trailer at the end of the road on the left-hand side which would be the east side of the road.  He advised that the subjects were outside in the garage cooking meth at the time of the call, and he advised that they had also started a fire just outside the garage when they started cooking.

Q.  Was this a telephone call that you received?

A.  Yes, sir.

Q.  Now, was there any other information that you've received recently--well, let's stick with December 9th[,] 2004, did you receive any other information on this address at 51 Bates Drive?

A.  That same night Officer Vaughn called the VMEG [(Vermilion County Metropoli-

- 4 -

tan Enforcement Group)] pager and advised that he had spoke [sic] to a female in Georgetown who had advised that they were cooking meth at 51 Bates Drive and that was at 8:25 p.m., that night.

Q. And for the record, who is Officer Vaughn?

A. He's a Georgetown police officer.

Q. To your knowledge was the--if you know, the person that called you and the person that called Officer Vaughn two different individuals?

A. Yes. I spoke to an older male subject, and he advised he spoke to a female subject.

Q. Do you know if these two people are related in any way?

A. No, I do not.

Q. Okay. Now, other than December 9th, 2004, do you have any other information about possible illegal activities with 51 Bates Drive?

A. On December 10th[,] Deputy Christian from the Sheriff's Department responded to a

call where he was advised that they were also cooking meth at 51 Bates Drive, and that subject advised him that they were fortifying the garage prior to cooking meth, said that they were doing that by barricading all the doors to the garage.

Q.   The person who contacted Officer Christian, was this person a male or female?

A.   I believe it was a male.

Q.   Do you know how this person contacted Christian?

A.   Through 911.

Q.   Okay.  Any other information recently that's current on 51 Bate Drive that might be relevant to illegal drug activity?

A.   On today's date I spoke with a male subject via the VMEG Office phone, he advised that he was at the residence *** last night, [December 14], and that there were several people at the residence preparing to cook meth.  He advised that there was not [enough] anhydrous ammonia to cook all of the pseudoephedrine that they had so that there was only a small cook done at the time.

- 6 -

Q.  That was last night, December 14th?

A.  That was last night.

Q.  Now, this individual that said they was [sic] cooking meth at 51 Bates Drive, did this individual refer to who they was [sic]?

A.  He advised that there were several people there, he did not know all of their names, knew one was [Bryant], knew another one by the first names of Shane, Frank and the last name of Grissom.

Q.  Okay.  Now, this person indicated they were cooking meth, from your training and experience do you recognize the ingredients and procedures used to make meth?

A.  Yes, sir.

Q.  What was discussed or indicated by this caller on December 14th to you that indicated to you that there really was meth being cooked there or would support what this person was saying?

A.  He called on the 15th and he advised that when he was there that there were filters, pseudoephedrine pills, Rooto and Coleman fuel.

- 7 -

Q. From your experience are those articles that are used to manufacture meth?

A. Yes, sir.

Q. Did he indicate whether or not the pseudoephedrine pills had been crushed or did he make any statement about that at all?

A. He advised that when he left *** the residence there was still a half of a freezer bag full of crushed pseudoephedrine, and he also advised that during the process of Bryant cooking meth he received about 606 grams from each cook.

Q. Did this individual describe anything about the anhydrous, like whether there was a tank there, whether there was ammonia there, the smell, anything about the anhydrous ammonia issue?

A. The caller advised that a male subject named Frank was the one who had the tanks with him in his vehicle and that Frank would be the one going today to steal anhydrous.

Q. Was there any indication of where they were going to steal the anhydrous, just

- 8 -

a general mention of that?

A.  The caller advised he thought it would be on State Line Road.

Q.  Now, you've mentioned the information that you have that's current as in the conversation to the--about yesterday's activity, and then December 9th and 10th information from you, Deputy Christian and Officer Vaughn from Georgetown, do you have any other information that predates this that would be consistent or add corroboration to this?

A.  No, sir, other than that the caller also stated there would be a cook today at the residence.

Q.  Now, let me go back, say, even a year ago.  Do you have any other information that would be consistent with [Bryant] being accused or indicated as being one that's involved in illegal drug activity?

A.  Yes, sir.  In October 2003 I received information through an anonymous caller that Bryant was selling meth and cocaine.  That Bryant's wife was--ex-wife was also going to the residence to buy drugs and

that Bryant ran around with several meth cooks. The caller also advised that he was selling from the Halfway Bar out on Route 150.

Q. Has the 51 Bates Drive been under surveillance of any kind today, today's date, December 15th[,] 2004?

A. We have responded out there earlier to get the physical description of the resi- dence and just information we needed for the execution of a warrant.

Q. Now, the individual that has told you about the activity last night, was there mention of specific activity going on in these outbuildings, or are you requesting the search warrant to cover those because they are there and it's possible that there might be something illegal in those based on the information you've received?

A. The caller stated that [there are] chemicals stored in the horse trailer that is in the driveway, advised that the pills would be in the garage area of the residence, and the two outbuildings we do not have any other

information on.

Q. Do you have any information from your personal contact with these anonymous callers, the ones that you have talked to, have they been different people on these other dates?

A. Yes, sir. The one I spoke with today appears to be a younger male.

Q. And then you spoke to somebody on the 9th?

A. Previously, that was an older male.

Q. And then did you yourself take information back in 2003 about [Bryant] that-- you've testified to it but did you actually receive that?

A. I did not personally take that information, no.

Q. Okay. To your knowledge everybody involved in providing this information has been anonymous; is that correct?

A. Yes, sir.

Q. So would it be a fair assumption to say then that nobody--being that they're not identified, nobody is being promised any

- 11 -

leniency or has any pending case that you're aware that would cause them to try to strike some kind of a deal with you?

A. No, sir, not that I'm aware of.

[PROSECUTOR:] I have nothing else, Your Honor.

THE COURT: All right. Upon examination of the complaint and hearing the testimony there are facts sufficient to show probable cause and a search warrant will issue for 51 Bates Drive, Danville, Vermilion County, Illinois, as described in the search warrant, and along with the residence, the two-car detached garage, the red and gray sheds located within the curtilage of the residence and the blue double[-]axle horse trailer in the driveway, those are all to be searched, and any items of United States currency, evidence of occupancy, residency or ownership, any controlled substances, drug paraphernalia, manufacturing chemicals or other items which constitute evidence of the offense of possession of a controlled substance with intent to deliver and possession of a

- 12 -

controlled substance are to be seized."

B. Defendant's Motion To Suppress

In July 2005, defendant filed a motion to suppress the evidence seized against him, arguing that no probable cause was shown to support issuance of a search warrant for his property.

At an August 2005 hearing presided over by Judge Thomas J. Fahey, defendant argued that (1) the complaint for search warrant was based solely on "tips" provided by four anonymous sources whose allegations lacked any indicia of reliability; (2) the anonymous sources' statements were uncorroborated because the police investigation confirmed only that defendant lived at the residence searched; and (3) even under the "totality-of-the-circumstances" analysis announced by the United States Supreme Court in Illinois v. Gates, 462 U.S. 213, 238-39, 76 L. Ed. 2d 527, 548, 103 S. Ct. 2317, 2332 (1983), a source's veracity, reliability, and basis of knowledge are relevant when determining whether probable cause existed to issue a search warrant. Specifically, defendant contended that no probable cause existed for Judge Clary to issue a search warrant because the police did not corroborate the information provided by the anonymous sources.

The State responded that (1) although four anonymous sources provided information about defendant, they were "inter-nally consistent" with each other; (2) Judge Clary's decision to

grant the search warrant was a practical determination based upon the evidence presented; and (3) even if no probable cause existed, Thompson relied in good faith upon the judge's decision to issue the search warrant.

After hearing the evidence and counsel's arguments, Judge Fahey determined that, in considering the totality of the evidence presented, probable cause existed to issue the search warrant. However, in January 2006, Judge Fahey reversed himself, explaining, in part, as follows:

> "The [c]ourt has become convinced that [the court has] made a mistake on the motion [to suppress], that it should have been granted in that the information on the face was not verified and it wasn't reliable. The only other question left at this point is under [Leon] and [its] progeny whether the good [-]faith exception would be applicable which would at that point become another issue that the [c]ourt will rule on."

Judge Fahey then scheduled a Leon hearing.

## C. The Leon Hearing

Master Sergeant Steve Guess, a 21-year veteran of the Illinois State Police, testified that he had been the VMEG Director since February 2005. Guess stated that a reasonably

- 14 -

trained officer (1) would have been familiar with the content of a VMEG intelligence information report, (2) would have preferred to have information from an identified source prior to seeking a search warrant, (3) would have documented information used as the basis for a search warrant, and (4) could have relied solely on information retrieved from the VMEG data repository that provided raw intelligence information received through various sources on specific individuals in a complaint for search warrant.

Michael Callahan, a retired patrol commander with approximately 25 years' experience with the Illinois State Police, testified that in 2001, he briefly supervised the VMEG director and was familiar with VMEG policies and procedures. Callahan stated that a reasonably trained officer would have (1) known that the information extracted from VMEG's drug files was strictly a synopsis of a particular VMEG intelligence information report that may not have been verified, (2) not relied solely on information from VMEG's drug files to secure a search warrant, (3) not attempted to obtain a search warrant based on unverified or uncorroborated information, and (4) attempted to identify anonymous sources to establish credibility and motive. Callahan stated that as a VMEG supervisor, he would not have approved a search warrant based on uncorroborated information from anonymous sources. On cross-examination, Callahan acknowledged that a reasonably trained officer would rely on a judge's determination

that probable cause existed to issue a search warrant.

During defendant's examination of both Guess and Callahan, the State objected on relevancy grounds to defendant's questions pertaining to VMEG policies and procedures. Specifically, the State argued that VMEG policies and procedures were not relevant to the Leon hearing or any of the four exceptions to the good-faith exception to the exclusionary rule. See Leon, 468 U.S. at 923, 82 L. Ed. 2d at 698-99, 104 S. Ct. at 3421 (where the United States Supreme Court outlined the four instances when the good-faith exception to the exclusionary rule would not apply). In overruling the State's continuing objection, Judge Fahey stated that knowledge of VMEG policies and procedures would be relevant to the first exception--that is, "if the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth." Leon, 468 U.S. at 923, 82 L. Ed. 2d at 698-99, 104 S. Ct. at 3421.

At the conclusion of the evidence, Judge Fahey determined that the Leon good-faith exception to the exclusionary rule did not apply. In so determining, Judge Fahey stated the following:

"As I said yesterday when I changed my
mind when I first heard this motion to sup-
press I was if nothing *** in more of a hurry

than anything else. *** [L]ooking at the complaint, it is obviously deficient, and [defense counsel] is correct, there is absolutely no corroboration, absolutely no basis for reliance on anything. And I suspect that the original issuing magistrate was basically like I was, *** the old saw that [']you throw enough shit on the wall that some of it's gonna [sic] stick,['] and perhaps this is what happened because I suspect this is what happened to me. ***

So first of all[,] *** there may have been a magistrate or a judge at one time say [sic] it was okay but that was because the judge was probably not fulfilling his judgely [sic] duties, and I will certainly take the blame for that because I should have suppressed this the first time it came up.

We get to [Leon], and we've heard an enormous amount of testimony on this, reasonably objective, what is. We've heard some police officers say, well, you should do this, some say you shouldn't.

* * *

- 17 -

That the police officer from what I've heard I think we would all agree should have done more before he had an application for search warrant. There should have been an attempt at corroboration, there should have been an attempt to verify any information. ***

The standard under [Leon] is whether or not--and we are dealing with whether the issuing judge was misled and in this case that the affiant would have known the information was incorrect had he gone out properly and done the things necessary. *** And the police officer who testified that he was reasonably well-trained in obtaining search warrants certainly didn't go to first base to ensure that he had the information necessary to present for a search warrant.

The ultimate goal was to, again, as I indicated earl[ier,] you put up enough dung on the wall to make it stick, to get it by a judge which he did, but I can't believe that the police officer reasonably believed *** from the evidence we have, that the facts he

- 18 -

was presenting would be sufficient for probable cause.  ***

So basically what we're really talking about is [the second part of <u>Leon</u>], the disregard, the reckless disregard, the other part of [<u>Leon</u>] was so lacking in the indicia of probable cause[,] which it just wasn't there.  As such, there would [<u>sic</u>] be a finding that there was not good faith.  The motion to suppress will be allowed."
This appeal followed.

## II. ANALYSIS

### A. The Complaint for Search Warrant

The State first argues that the trial court erred by determining that the complaint for search warrant did not contain sufficient information to justify the issuance of a search warrant.  We agree.

### 1. <u>Standard</u> <u>of</u> <u>Review</u>

Initially, we note that although technically we are reviewing Judge Fahey's order suppressing the evidence seized, we must begin our analysis by reviewing Judge Clary's decision that the complaint was sufficient to justify issuing the search warrant.  If we conclude that Judge Clary's decision was correct, then it necessarily follows that Judge Fahey erred by ruling that

the search warrant was issued without probable cause.

This procedural context exists because, as defendant argues in his brief to this court, when determining whether the search warrant was supported with probable cause, "this [c]ourt should only consider the facts which the issuing judge heard at the warrant application proceeding. It should not consider *** facts which came to light in subsequent *** hearings." Because in this case the trial court granted the motion to suppress, we agree with defendant and will limit our review accordingly.

In People v. Sutherland, 223 Ill. 2d 187, 219, 860 N.E.2d 178, 204 (2006), the Supreme Court of Illinois explained the standard of review that applied in the death-penalty case before it, in which the defendant made the same argument that defendant makes here--namely, that insufficient probable cause was presented to the trial court to justify the issuance of a search warrant. The supreme court described that standard of review as follows:

> "Affidavits must be viewed in a 'common-sense,' not a 'hypertechnical,' manner. People v. Thomas, 62 Ill. 2d 375, 380[, 342 N.E.2d 383, 386] (1975), quoting United States v. Ventresca, 380 U.S. 102, 109, 13 L. Ed. 2d 684, 689, 85 S. Ct. 741, 746 (1965) ***. Our function as the reviewing court is not to

substitute our judgment for that of the issuing magistrate but, rather, to ensure that the magistrate had a substantial basis for concluding that probable cause existed. *** Probable cause for a search warrant exists where '"given all the circumstances set forth in the affidavit *** there is a fair probability that contraband or evidence of a crime will be found in a particular place."' [People v.] Hickey, 178 Ill. 2d [256,] 285, [687 N.E.2d 910, 924 (1997),] quoting Illinois v. Gates, 462 U.S. 213, 238, 76 L. Ed. 2d 527, 548, 103 S. Ct. 2317, 2332 (1983)." Sutherland, 223 Ill. 2d at 219, 860 N.E.2d at 204.

See also People v. McCarty, 223 Ill. 2d 109, 153, 858 N.E.2d 15, 42 (2006) (a reviewing court must not substitute its judgment for that of the magistrate in construing an affidavit for a search warrant; rather, "the court must merely decide whether the magistrate had '"a substantial basis"' for concluding that probable cause existed").

The State asserts that this court should conduct a de novo review of the ultimate question of whether the evidence should be suppressed, citing People v. Pitman, 211 Ill. 2d 502, 512-13, 813 N.E.2d 93, 100-101 (2004), and defendant does not

disagree. However, given that we are reviewing whether Judge Clary was correct in determining that the complaint for search warrant presented him with sufficient evidence for the issuance of the search warrant, we conclude that applying a de novo standard of review to this question would be contrary to the Sutherland and McCarty decisions of the Supreme Court of Illinois and to United States Supreme Court doctrine.

In Massachusetts v. Upton, 466 U.S. 727, 728, 80 L. Ed. 2d 721, 724, 104 S. Ct. 2085, 2085 (1984) (per curiam), the Supreme Court considered its then-recent decision in Gates, 462 U.S. 213, 76 L. Ed. 2d 527, 103 S. Ct. 2317, when reviewing a decision of the Supreme Judicial Court of Massachusetts that, in turn, was reviewing whether the evidence before the judge justified the issuance of a search warrant. The Supreme Court noted that the Supreme Judicial Court, when interpreting the probable-cause requirement of the fourth amendment of the United States Constitution, "continued to rely on the approach set forth in cases such as Aguilar v. Texas, 378 U.S. 108[, 12 L. Ed. 2d 723, 84 S. Ct. 1509] (1964), and Spinelli v. United States, 393 U.S. 410[, 21 L. Ed. 2d 637, 89 S. Ct. 584] (1969)," even though "this approach was rejected in Gates." Upton, 466 U.S. at 728, 80 L. Ed. 2d at 724, 104 S. Ct. at 2086. The Court in Upton described its decision in Gates as holding

"that the Fourth Amendment's requirement

of probable cause for the issuance of a warrant is to be applied, not according to a fixed and rigid formula, but rather in the light of the 'totality of the circumstances' made known to the magistrate.  We also emphasized that the task of a reviewing court is not to conduct a de novo determination of probable cause, but only to determine whether there is substantial evidence in the record supporting the magistrate's decision to issue the warrant."  (Emphasis added.)  Upton, 466 U.S. at 728, 80 L. Ed. 2d at 724, 104 S. Ct. at 2085.

Ultimately, the Supreme Court reversed the Supreme Judicial Court of Massachusetts, and its reason for doing so applies to the standard of review in this case:

"The Supreme Judicial Court also erred in failing to grant any deference to the decision of the Magistrate to issue a warrant.  Instead of merely deciding whether the evidence viewed as a whole provided a 'substantial basis' for the Magistrate's finding of probable cause, the court conducted a de novo probable-cause determination.  We re-

- 23 -

jected just such after-the-fact, de novo scrutiny in Gates. [Citation.] 'A grudging or negative attitude by reviewing courts toward warrants,' United States v. Ventresca, 380 U.S. 102, 108[, 13 L. Ed. 2d 684, 689, 85 S. Ct. 741, 746] (1965), is inconsistent both with the desire to encourage use of the warrant process by police officers and with the recognition that once a warrant has been obtained, intrusion upon interests protected by the Fourth Amendment is less severe than otherwise may be the case. [Citation.] A deferential standard of review is appropriate to further the Fourth Amendment's strong preference for searches conducted pursuant to a warrant." Upton, 466 U.S. at 732-33, 80 L. Ed. 2d at 727, 104 S. Ct. at 2088.

Thus, in a case like this--namely, where we are reviewing the sufficiency of the evidence presented to the trial judge who issued the search warrant to determine whether sufficient probable cause was present for him to do so--United State Supreme Court doctrine mandates that the standard of review should be deferential. We view the recent decision of the Supreme Court of Illinois in People v. Caballes, 221 Ill. 2d 282, 313, 851 N.E.2d

- 24 -

26, 44-45 (2006), as supporting this conclusion, in which that court "reaffirm[ed] our commitment to limited lockstep analysis" with the United States Supreme Court's interpretation of fourth amendment doctrine.  See also In re Lakisha M., 227 Ill. 2d 259, 278, 882 N.E.2d 570, 581 (2008), quoting Caballes, 221 Ill. 2d at 309-10, 851 N.E.2d at 42-43, quoting L. Friedman, The Constitutional Value of Dialogue and the New Judicial Federalism, 28 Hastings Const. L.Q. 93, 104 (2000) (where the supreme court explained that under the limited lockstep approach, that court will "'"look first to the federal constitution, and only if federal law provides no relief turn to the state constitution to determine whether a specific criterion--for example, unique state history or state experience--justifies departure from federal precedent"'").

In concluding that the deferential standard of review applies to this case, we believe the United States Supreme Court's reference in Upton to Ventresca is very significant.  In Ventresca, the Court wrote the following:

> "In Jones v. United States, 362 U.S.
> 257, 270, [4 L. Ed. 2d 697, 707, 80 S. Ct.
> 725, 735 (1960),] this Court, strongly sup-
> porting the preference to be accorded search-
> es under a warrant, indicated that in a
> doubtful or marginal case a search under a

warrant may be sustainable where without one it would fall.  ***

'The point of the Fourth Amendment, which often is not grasped by zealous officers, is not that it denies law enforcement the support of the usual inferences which reasonable men draw from evidence.  Its protection consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime.  Any assumption that evidence sufficient to support a magistrate's disinterested determination to issue a search warrant will justify the officers in making a search without a warrant would reduce the Amendment to a nullity and leave the people's homes secure only in the discretion of police officers.'  Johnson v. United Stat-

- 26 -

es[, 333 U.S. 10, 13-14, 92 L. Ed. 436, 440, 68 S. Ct. 367, 369 (1948)]." Ventresca, 380 U.S. at 106, 13 L. Ed. 2d at 687-88, 85 S. Ct. at 744-45.

The Court in Ventresca explained how this policy should affect courts of review when deciding whether probable cause exists for the issuance of a search warrant:

"These decisions reflect the recognition that the Fourth Amendment's commands, like all constitutional requirements, are practical and not abstract. If the teachings of the Court's cases are to be followed and the constitutional policy served, affidavits for search warrants, such as the one involved here, must be tested and interpreted by magistrates and courts in a commonsense and realistic fashion. They are normally drafted by nonlawyers in the midst and haste of a criminal investigation. Technical requirements of elaborate specificity once exacted under common law pleadings have no proper place in this area. A grudging or negative attitude by reviewing courts toward warrants

- 27 -

will tend to discourage police officers from submitting their evidence to a judicial officer before acting." Ventresca, 380 U.S. at 108, 13 L. Ed. 2d at 689, 85 S. Ct. at 746.

We acknowledge that Ventresca is over 40 years old, but we believe the views it expressed, and the policies underlying those views, remain as valid today as they did then. Indeed, in our earlier discussion of the standard of review in this case, we quoted from the Supreme Court of Illinois' 2006 decision in Sutherland, which in turn quoted Ventresca as well as a 1975 decision of the Supreme Court of Illinois (People v. Thomas, 62 Ill. 2d 375, 342 N.E.2d 383 (1975)), which also cited Ventresca approvingly. In Thomas, the Supreme Court of Illinois quoted the same portion of Ventresca that we quoted above and concluded that "the principles there stated are valid and applicable here." Thomas, 62 Ill. 2d at 379, 342 N.E.2d at 385.

Interestingly, the decision of the Third District Appellate Court on review in Thomas to the supreme court (which the supreme court affirmed) reached the same conclusion in even stronger language:

"The complaint and affidavit were clearly sufficient to sustain the search warrant. To find otherwise in this case would be to apply a hypertechnical, rather

- 28 -

than a commonsense, interpretation and would not resolve doubtful or marginal cases according to the preference to be accorded to warrants as mandated in <u>Ventresca</u>." <u>People v. Thomas</u>, 24 Ill. App. 3d 932, 935, 321 N.E.2d 696, 699 (1974).

We also agree with the Ninth Circuit's observation that "[a]s <u>Gates</u> reminds us, probable cause does not demand the certainty we associate with formal trials." <u>United States v. Bishop</u>, 264 F.3d 919, 926 (9th Cir. 2001).

We note that the Seventh Circuit Court of Appeals, in <u>United States v. McIntire</u>, 516 F.3d 576, 578 (7th Cir. 2008), recently reached the same conclusion regarding the appropriate standard of review in a case such as this, writing as follows:

"A district court's finding of historical fact are reviewed for clear error, whether or not a warrant issued. [Citation.] A district judge's legal conclusions are reviewed without deference. And on the mixed question whether the facts add up to 'probable cause' under the right legal standard, we give no weight to the district judge's decision--for the right inquiry is whether the judge who issued the warrant (rarely the same as the

judge who ruled on the motion to suppress) acted on the basis of probable cause.  On _that_ issue we must afford 'great deference' to the issuing judge's conclusion."  (Emphasis in original.)

2. <u>Standard</u> <u>of</u> <u>Review</u> <u>at</u> <u>the</u> <u>Trial-Court</u> <u>Level</u>

Discussions of standards of review almost always involve standards employed by the supreme or appellate court when reviewing decisions made by a trial court.  However, occasionally (as in this case) a trial judge is called upon to review a decision made by a fellow trial judge.  Here, Judge Clary made the decision to issue a search warrant based upon the evidence he heard in support of taking that action, and Judge Fahey later presided at the hearing on defendant's motion to suppress, at which the issue was whether Judge Clary was correct to issue the search warrant.  In effect, Judge Fahey was "reviewing" Judge Clary's decision just as this court is now called upon to review Judge Clary's decision.  Under these circumstances, we hold that the standard of review to be employed by a fellow trial judge is the same standard of review this court employs--that is, as we previously explained, a deferential standard of review.

In so holding, we note that the policies that underlie the deferential standard of review for courts of review apply fully to a trial judge's review of a fellow judge's decision to

issue a search warrant.  Paraphrasing what the United States Supreme Court said in <u>Ventresca</u>, a grudging or negative attitude by any court reviewing the issuance of a search warrant toward such warrants will tend to discourage police officers from submitting their evidence to a judicial officer before acting. <u>Ventresca</u>, 380 U.S. at 108, 13 L. Ed. 2d at 689, 85 S. Ct. at 746.

### 3. <u>The</u> <u>Contents</u> <u>of</u> <u>the</u> <u>Complaint</u> <u>for</u> <u>Search</u> <u>Warrant</u>

We earlier set forth almost verbatim the contents of the complaint for search warrant presented to Judge Clary.  A summary of that complaint shows that Danville police officer Thompson, the affiant, received information, directly or indirectly, from four separate callers regarding defendant's residence at 51 Bates Drive (a mobile home), as well as some outbuildings and a horse trailer, that he sought a search warrant to search.

<u>Caller</u> <u>One</u>:  On the evening of December 9, 2004, an older male person called Thompson, informing him that defendant was going to be cooking methamphetamine at 51 Bates Drive and was actually in the process of doing so at the time of the call.  The caller, who wished to remain anonymous, described the trailer and informed Thompson that the subjects were outside in the garage cooking methamphetamine at the time of the call and "also started a fire just outside the garage when they started cooking."

Caller Two:  That same night, at 8:25 p.m., Georgetown police officer Vaughn called VMEG, the enforcement group with which Thompson was associated, and stated that he had spoken to a woman in Georgetown, who had advised that "they were cooking meth at 51 Bates Drive."

Caller Three:  On December 10, 2004, Vermilion County deputy sheriff Christian "responded to a [9-1-1] call where he was advised that they were also cooking meth at 51 Bates Drive." This person, who was a male, informed Christian that "they were fortifying the garage prior to cooking meth *** by barricading all the doors to the garage."

Caller Four:  On December 15, 2004, Thompson spoke with a person who sounded like a younger male.  He called the VMEG office phone and stated that he was at the 51 Bates Drive residence the night before, and several people were preparing to cook methamphetamine.  Because they did not have enough anhydrous ammonia to cook all of their pseudoephedrine, only a small cook was done at that time.  The caller said several persons were present, but he did not know all of their names.  He knew one was defendant and knew others by the first names of Shane and Frank and one by the last name of Grissom.  The caller specified that when he was present at 51 Bates Drive, filters, pseudoephedrine pills, Rooto, and Coleman fuel were present.  Based upon Thompson's training and experience, he recognized the ingredients and

procedures the caller discussed as those used to make methamphetamine. The caller further stated that when he left the residence, the freezer still contained half a bag of crushed pseudoephedrine and defendant received about 606 grams of methamphetamine from each cook. The caller also stated that the man named Frank had anhydrous tanks in his vehicle and intended to steal more anhydrous that day on the State Line Road. The caller added that there was going to be a methamphetamine cook that day at the residence. Last, the caller added that chemicals were stored in the horse trailer in the driveway, and the pills would be in the garage area of the residence.

Thompson added that to his knowledge, all of the people providing information asked to remain anonymous and no one had been promised anything regarding any pending cases they may have been involved in. In preparation for the complaint for search warrant, Thompson familiarized himself with the property, which in fact consisted of a mobile home, a two-car detached garage, a blue horse trailer sitting in the driveway, and two other outbuildings, a red shed and a gray shed. Thompson also confirmed that defendant and MeGehee lived at the residence.

Thompson also testified that in October 2003 (approximately 14 months earlier), he received information from an anonymous caller that (1) defendant was selling methamphetamine and cocaine, (2) defendant's ex-wife was going to the residence

to buy drugs, and (3) defendant "ran around with several meth cooks."  That caller also advised Thompson that defendant was "selling from the Halfway Bar up on Route 150."

After hearing this testimony, Judge Clary issued the search warrant.

### 4. Information in the Complaint for Search Warrant That Was Not Based on Anonymous Tips

Defendant characterizes the information presented to Judge Clary as being based upon "purely anonymous tips," which he asserts have minimal value unless the police are able to corroborate the tipsters' information.  With regard to at least one of the above callers about whom Thompson testified, this characterization is not correct.

In State v. Roth, 674 N.W.2d 495, 500 (N.D. 2004), the Supreme Court of North Dakota provided a helpful description of the three types of informants who provide police officer affiants with varying degrees of reliability:  citizen, confidential, and anonymous.  The court added that a "magistrate must take into account the status of an informant in judging his credibility or reliability."  Roth, 674 N.W.2d at 500.  The court further explained these descriptions, as follows:

> "A citizen informant is 'someone who
> volunteer[s] information, [does] not want
> anything in return for the information, and
> [is] not at risk or in fear of going to jail-

- 34 -

.' [Citation.] 'We have recognized that citizen informants are presumed reliable, and that their reliability should be evaluated from the nature of their report, their opportunity to hear and see the matters reported, and the extent to which it can be verified by independent police investigation.' [Citation.]

Generally, a confidential informant is known to the police officer, but his or her identity is concealed from the magistrate. [Citation.] *** 'A named "citizen informant" differs significantly from a *** confidential informant whose identity is being protected.' [Citation.] However, while a confidential informant does not enjoy the same presumed reliability as a citizen informant, he or she is still considered more reliable than an anonymous informant. Indeed, we have previously stated that '[t]he most reliable tip is *** one relayed personally to the officer.' [Citation.]

An anonymous informant is one unknown to both the investigating officer and the magis-

trate." <u>Roth</u>, 674 N.W.2d at 500.

Consistent with the description of informants provided in <u>Roth</u>, we deem caller three to be at least a confidential informant, if not a citizen informant.  We note that caller three contacted Deputy Christian by calling 9-1-1, and Christian informed Thompson that Christian "responded to a call where he was advised that they were also cooking meth at 51 Bates Drive." Thus, at a minimum, caller three was either an identified or a identifiable citizen because he called a police emergency number to provide the police with information.  When Thompson described that Deputy Christian was "responding to a call" where he learned that people were cooking meth at 51 Bates Drive, that statement suggests that Christian had personal contact with the caller as a follow-up to the caller's 9-1-1 call.

This latter point is significant because this court has recently held that "'[a]n emergency call to police should not be viewed as an "anonymous" tip or [be viewed] with the skepticism applied to tips provided by confidential informants.'"  <u>People v. Ewing</u>, 377 Ill. App. 3d 585, 592, 880 N.E.2d 587, 594 (2007), quoting <u>People v. Shafer</u>, 372 Ill. App. 3d 1044, 1054, 868 N.E.2d 359, 367 (2007).  We further added in <u>Ewing</u> that "calls made to a police emergency number are considered more reliable than other calls because the police have enough information to identify the caller even if the caller does not give his or her name."  <u>Ewing</u>,

377 Ill. App. 3d at 595, 880 N.E.2d at 596.  In Shafer, we quoted approvingly from the Supreme Court of New Jersey in State v. Golotta, 178 N.J. 205, 219-20, 837 A.2d 359, 367-68 (2003), regarding the reliability of a 9-1-1 call, as follows:

"'[W]e agree with the State that a 9-1-1 call carries a fair degree of reliability inasmuch as "it is hard to conceive that a person would place himself or herself at risk of a criminal charge by making such a call." The police maintain records of 9-1-1 calls not only for the purpose of responding to emergency situations but to investigate false or intentionally misleading reports.  ***  On balance, we are satisfied that in an expanding number of cases[,] the 9-1-1 system provides the police with enough information so that users of that system are not truly anonymous even when they fail to identify themselves by name.

Accordingly, the State stands on firm constitutional ground when it treats the anonymous 9-1-1 caller in the same fashion as it would an identified citizen informant who alerts the police to an emergent situation.

- 37 -

> *** Analogous to a report offered by a citi-
> zen informant, the information imparted by a
> 9-1-1 caller should not be "viewed with the
> same degree of suspicion that applies to a
> tip by a confidential informant." [Cita-
> tion.]'"  Shafer, 372 Ill. App. 3d at 1050,
> 868 N.E.2d at 364.

See also United States v. Schaefer, 87 F.3d 562, 566 (1st Cir. 1996) ("information provided by ordinary citizens has particular value in the probable cause equation"); United States v. Scalia, 993 F.2d 984, 987 (1st Cir. 1993) ("where the informant was 'not a professional *** but a private citizen with no known criminal record or other criminal contacts, who came forward on his own *** [,] the informant's story may be more easily accepted ***.'" (Emphasis omitted.)  United States v. Campbell, 732 F.2d 1017, 1019 (1st Cir. 1984).

### 5. Factors Which May Support a Finding of Probable Cause To Issue a Search Warrant

When examining the sufficiency of a complaint for search warrant that is based upon information provided to the affiant by third parties, courts may consider certain factors when assessing the totality of the circumstances.  As the Seventh Circuit Court of Appeals explained in United States v. Olson, 408 F.3d 366, 372 (7th Cir. 2005), each bit of information presented to the magistrate, when assessed on an individual basis, may not

provide much, and the weight of each item separately may be slight. Nonetheless, together they may suffice to corroborate an informant's story and, when viewed through the "totality-of-the-circumstances" <u>Gates</u> standard, provide enough to establish probable cause.

　　　　　　　a. Corroboration of the Information

　　　In <u>United States v. Fulgham</u>, 143 F.3d 399, 401 (8th Cir. 1998), quoting <u>United States v. Williams</u>, 10 F.3d 590, 593 (8th Cir. 1993), the court wrote that "'[i]nformation may be sufficiently reliable to support a probable[-]cause finding if the person providing the information has a track record of supplying reliable information, or if it is corroborated by independent evidence.'" On the facts of that case, the <u>Fulgham</u> court concluded that "the information given by the first informant was corroborated with specific, consistent details provided by the second informant. In fact, the two informants' tips were reciprocally corroborative rendering their information enough to support a finding of probable cause." <u>Fulgham</u>, 143 F.3d at 401. As this court explained in <u>People v. Brannon</u>, 308 Ill. App. 3d 501, 506, 720 N.E.2d 348, 352 (1999), quoting <u>Gates</u>, 462 U.S. at 244-45, 76 L. Ed. 2d at 552, 103 S. Ct. at 2335, "[t]he goal of corroboration is to reduce the chance of acting on a '"reckless or prevaricating tale"' and establish a basis for crediting the tip." See also <u>United States v. Goodson</u>, 165 F.3d 610, 614 (8th

Cir. 1999) (citing Fulgham approvingly and concluding that the tips of two informants who did not have a track record of reliability corroborated "the first informant's tip and to some extent each other's tips").  In United States v. Pritchard, 745 F.2d 1112, 1121 (7th Cir. 1984), the Seventh Circuit wrote that the informants in that case, by telling consistent yet independent stories, "provide 'cross-corroboration,' and enhance the reliability of the application [for a search warrant] as a whole."  In Schaefer, 87 F.3d at 566, the First Circuit wrote that "[c]ourts often have held that consistency between the reports of two independent informants helps to validate both accounts."

More recently, the Eighth Circuit found sufficient probable cause for the issuance of a search warrant in a case where various sources referred to in the deputy's affidavit

> "all pointed to the same conclusion that [the defendant] was operating an illegal drug business out of his home, and some of that information was exceptionally detailed. Collectively, the information provided in the affidavit quite clearly gives rise to 'a fair probability that contraband or evidence of a crime' [citation] would be found at [the defendant's] residence."  United States v.

Hallam, 407 F.3d 942, 948 (8th Cir. 2005).

We also note that in this case, Thompson was able to corroborate some of the information he received by determining that (1) defendant resided at 51 Bates Drive and (2) the description of the premises was accurate, including the presence of a horse trailer. See United States v. Carpenter, 422 F.3d 738, 744 (8th Cir. 2005) (where the court, when assessing whether probable cause was shown for issuing a search warrant, considered as a positive factor that the police officer affiant "also corroborated the [informant's] tip through his own investigation, which confirmed the location of the house and verified the name and address provided by the informant").

We also note additional corroboration by Thompson of the information he received because, as he testified before Judge Clary, Thompson recognized from his training and experience "the ingredients and the procedures used to make meth[amphetamine]."

### b. The Extent of Details Present in the Complaint for Search Warrant

The extent of details that a complaint for search warrant contains matters. As the Supreme Court of Kentucky explained in Lovett v. Commonwealth, 103 S.W.3d 72, 78 (Ky. 2003), quoting United States v. Sonagere, 30 F.3d 51, 53 (6th Cir. 1994), "'explicit and detailed description of alleged wrongdoing, along with a statement that the event was observed first-hand, entitles [the informant's] tip to greater weight than

might otherwise be the case.'" Lovett, like the present case, involved information provided to the affiant-police officer that contained detailed descriptions of the defendant's methamphetamine manufacturing operation and the contents of his methamphetamine laboratory. Lovett, 103 S.W.3d at 78. For instance, the informant in Lovett gave the affiant "a detailed description of the anhydrous ammonia tank that [the defendant] moved into his barn, including its color and capacity." Lovett, 103 S.W.3d at 78. The Kentucky Supreme Court in Lovett concluded that "[t]he level of detail provided by the confidential informant in this case, in addition to [a] statement of first-hand observation, lends significant reliability to the information he provided." Lovett, 103 S.W.3d at 78.

In Brannon, this court also addressed the importance of details, writing as follows:

"Also significant is the specificity with which the tipster described defendant's criminal conduct. *** Notably, the tipster provided a specific (albeit not exact) quantity of a specific type of contraband and indicated it would be in defendant's trunk, as opposed to in his car generally. While these facts are conclusory allegations, their specificity indicates that the tipster had

- 42 -

knowledge of defendant's habits and activities and that the tip was not merely a 'prevaricating tale.'" <u>Brannon</u>, 308 Ill. App. 3d at 508, 720 N.E.2d at 354.

We earlier quoted from <u>Hallam</u>, 407 F.3d at 948, in which the Eighth Circuit deemed it significant that some of the information provided to the officer-affiant "was exceptionally detailed."  Similarly, in <u>Bonsness v. State</u>, 672 P.2d 1291, 1293 (Wyo. 1983), the Supreme Court of Wyoming observed that the United States Supreme Court in <u>Gates</u>

"pointed out that even if there is some doubt as to the informant's motives, his detailed description of criminal activity along with his statement that the event was observed firsthand, entitles his 'tip' to carry greater weight than *** might otherwise [be the case]."

Last, in <u>Scalia</u>, 993 F.2d at 987, quoting <u>United States v. Taylor</u>, 985 F.2d 3, 6 (1st Cir. 1993), the First Circuit wrote that an affidavit in support of a search warrant "'may disclose an adequate basis for evaluating the informant's veracity through the very specificity and detail with which it relates the informant's first-hand description of the place to be searched or the items to be seized.'"  (Emphasis omitted.)

- 43 -

### 6. Judge Clary Did Not Err by Issuing the Search Warrant in This Case

The State argues that Judge Clary received information to justify his issuing the search warrant, and Judge Fahey erred by concluding otherwise and suppressing the evidence the police seized. Specifically, the State contends that

> "[u]sing the totality[-]of[-]the[-]circumstances test, the number of the informants, the consistency of their reports, the details of their reports, the intimate knowledge of at least one of the informants with the intricacies of manufacturing methamphetamine, and the corroboration by the police department all establish probable cause for the issuance of the search warrant, i.e., a reasonable and prudent person would have believed from the information provided that there was a probability that defendant was possessing the tools and chemicals necessary to manufacture methamphetamine and had manufactured methamphetamine."

When judged in accordance with the applicable standard of review, we agree.

In so concluding, we have considered the following counsel from the United States Supreme Court in Leon:

- 44 -

"Reasonable minds frequently may differ on the question whether a particular affidavit establishes probable cause, and we have thus concluded that the preference for warrants is most appropriately effectuated by according 'great deference' to a magistrate's determination." Leon, 468 U.S. at 914, 82 L. Ed. 2d at 693, 104 S. Ct. at 3416.

We have also carefully considered the Supreme Court's counsel in Gates, where the Court wrote the following:

"Perhaps the central teaching of our decisions bearing on the probable-cause standard is that it is a 'practical, nontechnical conception.' [Citation.] 'In dealing with probable cause, ... as the very name implies, we deal with probabilities. These are not technical; they are factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.' [Citation.] ***

'The process does not deal with hard certainties, but with probabilities. Long before the law of probabilities was articulated as such, practical people formulated

certain common-sense conclusions about human behavior; jurors as factfinders are permitted to do the same--and so are law enforcement officers.  Finally, the evidence thus collected must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement.'"  Gates, 462 U.S. at 231-32, 76 L. Ed. 2d at 544, 103 S. Ct. at 2328-29, quoting United States v.Cortez, 449 U.S. 411, 418, 66 L. Ed. 2d 621, 629, 101 S. Ct. 690, 695 (1981).

Given the policy considerations we discussed earlier, we also agree with the observation of the Seventh Circuit that "we must keep in mind that doubtful cases should be resolved in favor of upholding the [search] warrant."  United States v. Quintanilla, 218 F.3d 674, 677 (7th Cir. 2000).

Last, perhaps the Supreme Court of Illinois said it best in People v. Stewart, 104 Ill. 2d 463, 477, 473 N.E.2d 1227, 1233 (1984), where the court wrote the following:

"'Although in a particular case it may not be easy to determine when an affidavit demonstrates the existence of probable cause, the resolution of doubtful or marginal cases

in this area should be largely determined by the preference to be accorded to warrants.' (United States v. Ventresca (1965), 380 U.S. 102, 109, 13 L. Ed. 2d 684, 689, 85 S. Ct. 741, 746.)  Read in a common-sense and realistic fashion, the affidavits contained sufficient specificity in light of the totality of the circumstances to justify the issuance of the search warrants.  There was a substantial basis for the magistrate's finding of probable cause.  (Massachusetts v. Upton (1984), 466 U.S. 727, 80 L. Ed. 2d 721, 104 S. Ct. 2085.)"

B. The Good-Faith Exception to the Exclusionary Rule

The State also argues that the trial court erred by determining that the Leon good-faith exception to the exclusionary rule did not apply in this case.  We agree.  (See Olson, 408 F.3d at 372, where the Seventh Circuit, after rejecting the defendant's argument that the complaint for search warrant did not provide enough to establish probable cause, added the following:  "In any event, the warrant would be saved by the good[-]faith exception.")

In Illinois v. Krull, 480 U.S. 340, 348, 94 L. Ed. 2d 364, 374, 107 S. Ct. 1160, 1166 (1987), the United States Supreme

Court wrote that the Court held in Leon that "the exclusionary rule should not be applied to evidence obtained by a police officer whose reliance on a search warrant issued by a neutral magistrate was objectively reasonable, even though the warrant was ultimately found to be defective."  In Stewart, 104 Ill. 2d at 477, 473 N.E.2d at 1233, the Supreme Court of Illinois adopted the holding in Leon for this state, writing as follows:  "Even if one assumes a want of particularity in the affidavits, the agents' reasonable and good-faith belief, although a possibly mistaken one, that the searches were authorized under the warrants, insulated the searches from a motion to suppress."

As this court noted in People v. Cooke, 299 Ill. App. 3d 273, 281, 701 N.E.2d 526, 531 (1998), the Supreme Court in Leon listed four situations in which the good-faith exception did not apply:

> "'(1) where the judge in issuing a warrant
> was misled by information in an affidavit
> that the affiant knew was false or would have
> known was false except for his reckless dis-
> regard of the truth [citation]; (2) where the
> issuing judge wholly abandoned his judicial
> role ***; (3) where the affidavit is so lack-
> ing in indicia of probable cause as to render
> official belief in its existence entirely

unreasonable [citation]; and (4) where a

warrant is so facially deficient that the

executing officers cannot reasonably presume

it to be valid [citations]. [Citation.]'"

Cooke, 299 Ill App. 3d at 281, 701 N.E.2d at

531, quoting People v. Bohan, 158 Ill. App.

3d 811, 818, 511 N.E.2d 1384, 1389 (1987).

We agree with the Seventh Circuit's characterization of the Leon good-faith exception.  In United States v. Peck, 317 F.3d 754, 757 (7th Cir. 2003), that court first noted that a police officer's decision to obtain a search warrant "is prima facie evidence that he was acting in good faith."  The court further explained as follows:

"To rebut this evidence[, the defendant] must

show that the magistrate simply rubber-stamp-

ed the warrant application, the officers were

dishonest or reckless in preparing the affi-

davit, or the warrant was so lacking in prob-

able cause that no officer could have relied

on it."  Peck, 317 F.3d at 757.

No colorable argument can be made on this record that Judge Clary wholly abandoned his judicial role when he issued the search warrant at issue, and defendant does not so argue. Regarding the third and fourth situations, their inapplicability

in this case is best shown by our earlier holding that Judge Clary did not err by determining that the State had presented sufficient probable cause for him to issue the search warrant. Defendant's claim that the complaint for search warrant "was utterly lacking indicia of probable cause" is wholly without merit.

Defendant primarily argues that Judge Fahey was correct in rejecting the good-faith exception because Judge Clary, when he issued a search warrant, "was misled due to Thompson's 'reckless disregard' for the truth." This argument is groundless.

The evidence presented at the Leon hearing contains no suggestion whatsoever that Thompson misled Judge Clary by presenting information Thompson either knew was false or would have known was false except for his reckless disregard of the truth. Instead, defendant's contention at the Leon hearing, which he repeats to this court, is that Thompson could have done more to investigate either defendant's circumstances or the information Thompson received from his fellow officers and the informants before seeking a search warrant. When the State objected at the Leon hearing to defendant's evidence and argument on this point, Judge Fahey overruled the objection and permitted defendant to present evidence from other current or retired police officers regarding their views on what should have been done in this case before obtaining a search warrant. The State's objection to this

evidence should have been sustained because the evidence was totally immaterial at a <u>Leon</u> hearing. In support of this conclusion, we agree with the views recently expressed by the Seventh Circuit Court of Appeals in <u>United States v. Lowe</u>, 516 F.3d 580, 584-85 (7th Cir. 2008), that "[t]he exclusionary rule serves to deter officers from obtaining warrants based on false information, not to deter them from obtaining warrants based on accurate information that is reported to the issuing state judge in a somewhat slipshod manner."

As an alternative ground, defendant seems to argue that Thompson misled Judge Clary because Thompson either knew or suspected more than he testified to when he sought the search warrant. Even if this were true, defendant does not explain how such omissions could meet the standards we discussed earlier for concluding that the good-faith exception did not apply. This is particularly true here, when the alleged omissions, had they been called to the attention of Judge Clary, would have <u>strengthened</u>, not <u>weakened</u>, the State's justification for the issuance of a search warrant. As we discussed earlier in this opinion, the less anonymous the sources of information, the more reliable they generally will be viewed.

The essence of defendant's argument for the <u>Leon</u> good-faith exception not to apply is that Thompson was a negligent or careless police officer who could have done more before he sought

a search warrant from Judge Clary. However, this contention has nothing to do with whether the good-faith exceptions apply, and Judge Fahey should have entirely rejected this contention, as do we.

Like Monday-morning quarterbacks, attorneys after the fact can always examine what the State presented to the issuing judge in support of the State's request for a search warrant and point out additional steps that the police could have taken or additional information that could have been called to the judge's attention. However, such arguments demonstrate a fundamental misunderstanding of the search-warrant process, which frequently is up against time constraints and primarily involves police officers, not "legal technicians." See Gates, 462 U.S. at 231, 76 L. Ed. 2d at 544, 103 S. Ct. at 2328.

After the fact, such legal technicians can always sift through all aspects of the case to point out where more could have been done. However, as the Supreme Court noted in Ventresca and Leon, among other cases, the constitutional scheme the framers envisioned to secure the fourth amendment's protection is that agents of the State would garner whatever evidence they possess and believe sufficient to justify the issuance of a search warrant and present it under oath to a neutral magistrate. If, in fact, the evidence is not sufficient in the magistrate's judgment to demonstrate probable cause for the issuance of a

search warrant, the magistrate has a constitutional duty to reject the State's request. Indeed, a magistrate's oath to uphold the constitution requires the magistrate to do just that. Thus, the presentation to--and rejection by--the neutral magistrate is the brake upon the State's power that the constitution envisions.

On the other hand, if the State truthfully presents its evidence under oath in support of a search warrant to a neutral magistrate and the magistrate determines that sufficient probable cause is shown to issue the warrant, then the police officer-affiant has done all that the constitution requires of that officer.

For the reasons stated, Judge Fahey committed blatant error by concluding that the good-faith exceptions did not apply in this case.

### III. CONCLUSION

For the reasons stated, we reverse the trial court's judgment suppressing the evidence and remand for further proceedings consistent with the views expressed herein.

Reversed and remanded.

McCULLOUGH and MYERSCOUGH, JJ., concur.