2020 IL App (1st) 172016-U

FIFTH DIVISION
February 14, 2020

No. 1-17-2016

**NOTICE:**  This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of Cook County. |
| Respondent-Appellee, | ) ) | |
| v. | ) ) | No. 11 CR 17054 |
| GYASI BANNER, | ) ) ) | Honorable Neera Lall Walsh, |
| Petitioner-Appellant. | ) | Judge Presiding. |

JUSTICE DELORT delivered the judgment of the court.
Presiding Justice Hoffman and Justice Rochford concurred in the judgment.

**ORDER**

¶ 1     *Held:*  The circuit court did not err in summarily dismissing petitioner's petition for postconviction relief.  Affirmed.

¶ 2     Following a jury trial, petitioner Gyasi Banner was convicted of attempted murder, aggravated criminal sexual assault, aggravated discharge of a firearm, and the violation of an order of protection.  The trial court sentenced him to 47 years' imprisonment.  On direct appeal, we granted petitioner additional presentence custody credit and vacated his conviction for aggravated discharge of a firearm, but otherwise affirmed his conviction and sentence.  See *People v. Banner*, 2015 IL App (1st) 132974-U.  Petitioner then filed a petition pursuant to the Post-Conviction

Hearing Act (the Act) alleging, *inter alia*, that he received ineffective assistance of trial counsel and his sentence is an unconstitutional *de facto* life sentence. Petitioner now appeals the circuit court's summary dismissal of his petition, contending that (1) trial counsel was ineffective in failing to investigate petitioner's testimony prior to advising him to waive his right to testify; and (2) his 47-year aggregate sentence is an unconstitutional *de facto* life sentence. We affirm.

¶ 3                                    BACKGROUND

¶ 4    The facts adduced at trial were thoroughly set forth in petitioner's direct appeal. See *id.* ¶¶ 4-36. Accordingly, we will limit our discussion only to those facts pertinent to the issues raised here.

¶ 5    Petitioner was charged in a multi-count indictment with, *inter alia*, aggravated criminal sexual assault, aggravated discharge of a firearm, attempted first degree murder, and violating an order of protection.

¶ 6    The victim, J.M., testified that she and petitioner have a son, Gyasi, Jr., who was born in February 2011. In July 2011, J.M. obtained an order of protection against petitioner following an altercation in which she received a black eye that burst open from swelling, a "busted" lip, and bruising.

¶ 7    Early on the morning of September 20, 2011, J.M. said that petitioner arrived at her aunt's residence where J.M. was living. Petitioner asked to see his son, and J.M. agreed despite the order of protection. J.M. stepped out onto the porch, and while she was still holding the baby, petitioner hugged and kissed the baby, and told him that petitioner loved him and would see him "in heaven." J.M. told petitioner not to say that to the baby and turned to go back into the house. Petitioner began to walk away but told J.M. to wait because petitioner had something for her. Petitioner then pulled out a gun from his book bag.

¶ 8    J.M. tried to go into the house, but petitioner grabbed the back of her head and held the gun to her chin while J.M. was holding the baby. Petitioner said that there would be "problems" if he found out the baby was not his or if J.M. was "messing around" on petitioner. Petitioner said he would not hurt the baby but would instead "end it" for both of them right there. While holding the gun to J.M.'s face, petitioner forced J.M. upstairs despite her protests.

¶ 9    They went upstairs, and petitioner told J.M. to put the baby in a car seat so that they could talk. J.M. did not, so petitioner took the baby from J.M., placed him in a car seat in the upstairs bedroom and told J.M.'s four-year-old sister to watch him. J.M. and petitioner then went into the bathroom, and petitioner locked the door.

¶ 10    J.M. was standing in front of the bathroom sink, and petitioner was standing behind her, kissing her neck. J.M. told him that she did not want to have sex, but petitioner responded, "I didn't ask you what you wanted to do, I'm gonna take it." Petitioner then placed the gun on the sink, pulled down J.M.'s pants and underwear, bent her over, and placed his penis in her vagina.

¶ 11    Afterwards, petitioner told J.M. to "fix" her face because she had been crying. Petitioner left with the baby and warned her that there would be "a problem" if she did not come downstairs in 15 minutes. J.M. quickly dressed and went downstairs.

¶ 12    J.M. met petitioner back on the porch, and petitioner gave her the baby. Petitioner accused J.M. of "messing up his life" and blamed her for his criminal record. J.M. laughed at him, and petitioner threatened to "slap the dog shit out of [her]" if she laughed at him again. J.M. again laughed, and petitioner slapped her face. The baby started crying.

¶ 13    Tonia Darby-Jones, J.M.'s aunt, came out and told J.M. to go inside the house. Petitioner told J.M. to "hold on" and that Darby-Jones "can wait." Darby-Jones again told J.M. to go into the house, so J.M. went inside, put the baby to bed, and called the police.

¶ 14 After she hung up, she could hear arguing on the porch between her aunt, her aunt's boyfriend (Capton Brown), and petitioner. J.M. then saw Brown and petitioner in a fistfight. J.M. called the police a second time, again telling them that petitioner had a gun and that they should come quickly. J.M. told Darby-Jones that the gun was in petitioner's book bag on the porch. Darby-Jones brought the bag into the house, locked the door, and found the gun.

¶ 15 Petitioner returned and demanded his bag, but Darby-Jones refused. Petitioner then tore the door off its hinges and took the bag. J.M. and Darby-Jones were standing in the doorway, about two feet from petitioner, when petitioner removed the gun and began firing at Brown. After shooting at Brown, petitioner returned the gun to the book bag and left.

¶ 16 The police arrived, and after J.M. spoke to a detective at the police station, she was transported to a nearby hospital. J.M. went to the hospital for analysis with a "rape kit," but she declined and was discharged.

¶ 17 On cross-examination, J.M. conceded that she did not say anything to her four-year-old sister after petitioner placed Gyasi Jr. in a car seat and left the baby with the four-year-old. J.M. also agreed that she did not try to escape after petitioner placed the gun on the bathroom sink.

¶ 18 J.M. further conceded that she visited petitioner more than 10 times since the time of the assault and wrote three letters to petitioner. J.M. wrote that she loved and missed petitioner. She further expressed remorse for his incarceration and her wish that petitioner was with her to help raise their child. J.M. admitted that, in one of her letters, she wrote that she did not know whether petitioner should "move on" but that she would not beg him to stay and was "damn sure not gonna [sic] play 2nd to no bitch!" The letters also stated that the Department of Children and Family Services (DCFS) threatened to "take" their child from her due to child endangerment or neglect if she did not follow through with her sexual assault accusation.

¶ 19    Darby-Jones testified that, on the morning of September 20, she answered the door and saw petitioner, who asked to see J.M. She called to J.M. that petitioner was at the door and went back to sleep. After "a few" hours, Darby-Jones got up and began cooking. She saw J.M. go out the front door with the baby. Later, Darby-Jones asked J.M. several times to come inside because the food was ready, but J.M. did not come back. Brown, who had spent the prior evening at the house and had been entering and leaving the house that morning while getting ready for work, came in and told Darby-Jones that petitioner had threatened to slap J.M.

¶ 20    Darby-Jones then went to the porch and asked J.M. twice to come into the house. When J.M. went into the house, Darby-Jones told petitioner to leave, but petitioner replied, "Bitch, I ain't going nowhere." Darby-Jones began arguing with petitioner, demanding that he leave, and Brown, who had been standing in front of Darby-Jones's car, walked over and told petitioner to leave. Brown and petitioner began arguing, and then started fighting. The fight ended shortly thereafter, and Darby-Jones saw petitioner shake Brown's hand.

¶ 21    Darby-Jones walked back into her house and received a call from the police asking to confirm that there had been a report of a person with a gun. After J.M. told her where it was, Darby-Jones saw the gun in petitioner's book bag and brought the bag into the house. Petitioner walked up to the front door and demanded his book bag, but Darby-Jones refused and said the police were coming. Petitioner kicked the exterior door off its hinges and pushed open the interior door. Petitioner took the bag to the porch and took out the gun.

¶ 22    Darby-Jones yelled out to Brown that petitioner had a gun. Darby-Jones said petitioner shot five or six times in Brown's direction. Brown heard Darby-Jones yell to him and began running down the street when he saw petitioner remove the gun. Although Brown heard the shots and testified that he saw petitioner point the gun at him, he did not see petitioner shoot at him.

Nonetheless, Brown testified that the shots came from behind him and that they were close to him. Petitioner then left, and after Darby-Jones called the police, she got into a car and followed petitioner down the street.

¶ 23    Following the State's presentation of witness testimony, the following colloquy took place.

"THE COURT:  Okay.  We are back on the record.  We are outside the presence of the jury[;] we took a brief recess.  The State is present, the Defense is present, the Defendant is present also.

The State is anticipating putting in two documents, then I believe they're going to be resting.  ***.

*** I've been informed by [defense counsel] that her client does not wish to testify, which she has had an opportunity to discuss this with him.  The Court is now going to be making inquiry of Mr. Banner also.

Mr. Banner, do you understand the decision to testify is a decision that is yours, and yours alone to make?

THE DEFENDANT:  Yes.

THE COURT:  All right.  And you can consult with your lawyers, which is what you have done; is that correct?

THE DEFENDANT:  Yes.

THE COURT:  Okay.  And what did you decide, after consulting with your lawyers:  Do you wish to testify or not?

THE DEFENDANT:  No, I do not.

* * *

THE COURT: All right. Then, okay. The Court accepts that the Defendant is knowingly and willingly making an informed decision not to testify at this time, ***."

¶ 24 The jury subsequently found petitioner guilty of attempted murder, aggravated criminal sexual assault, aggravated discharge of a firearm, and violation of an order of protection. The jury further found that, during the commission of the attempted murder, petitioner was armed with and personally discharged a firearm.

¶ 25 During defendant's sentencing hearing, the circuit court recounted that it had an opportunity to hear the trial testimony and consider the statutory aggravating and mitigating factors. The court added that it was "taking into consideration especially this defendant's age and the facts of this case and what the range is in this case and this defendant's background." The court stated that the minimum aggregate sentence was 47 years. It noted that, although the minimum sentence might appear harsh, "the facts in this case [call] for a harsh sentence as there were some serious and egregious things that happened ***." The court added that it was also "very mindful of this defendant's youth," reiterating that defendant was a young man. The court then sentenced petitioner to consecutive terms of 26 years and 21 years for the attempted murder and aggravated criminal sexual assault convictions, respectively. The court noted that those sentences were the mandatory minimum sentences and had to be served consecutively pursuant to statute. The trial court also imposed concurrent sentences of four years and three years on the aggravated discharge of a firearm and violation of an order of protection convictions, respectively.

¶ 26 On direct appeal, petitioner contended that (1) the State failed to prove him guilty of aggravated criminal sexual assault beyond a reasonable doubt; (2) his trial counsel rendered ineffective assistance by failing to seek severance and present evidence that would have impeached

the victim's credibility; (3) the indictment for the violation of an order of protection charge was void; (4) his conviction for aggravated discharge of a firearm should be vacated under the one act, one crime doctrine; and (5) he was entitled to additional presentence custody credit. *Banner*, 2015 IL App (1st) 132974-U, ¶ 2. We vacated his aggravated discharge of a firearm conviction and modified his mittimus to reflect the correct presentence custody credit, but we otherwise rejected his claims and affirmed his remaining convictions and sentence. *Id.* ¶ 87.

¶ 27 On April 5, 2017, petitioner filed his postconviction petition. His petition alleged, *inter alia*, that his trial counsel rendered ineffective assistance for failure to consult with and determine petitioner's testimony on his own behalf prior to advising him not to testify. Petitioner stated that trial counsel advised him not to testify because she believed the State's evidence was weak. Petitioner attached an affidavit to his petition in which he stated that, although he wanted to testify, his trial counsel said that he should not because he was unprepared to do so and thus "might say the wrong thing." Petitioner denied sexually assaulting J.M. and further denied entering the house until he had to force his way in to retrieve his book bag. Petitioner explained that there was no "need" for him to sexually assault J.M. because he also had two other children by two other women with whom he continued to have a relationship while he was in a relationship with J.M. Petitioner speculated that J.M. accused him of rape because she was angry at petitioner for breaking off their engagement and revealing that he was going back to the mother of one of his other children.

¶ 28 Petitioner further stated in his affidavit that he never tried to kill Brown. Instead, petitioner asserted that, after their altercation ended peacefully, J.M.'s aunt took petitioner's book bag into the house. Petitioner forced his way in and took the bag, at which point Darby-Jones spat on him. Petitioner then kicked the door in, knocking Darby-Jones to the floor, and spat on her. The gun fell out of the bag, and Darby-Jones alerted Brown that petitioner had a gun. Brown first ran

toward petitioner but fled when petitioner pulled out the gun. Petitioner stated that he fired his gun only in the air and not at Brown to ensure that Brown would continue fleeing.

¶ 29   Petitioner further claimed that his aggregate 47-year sentence, which was imposed when he was 20 years old, was an unconstitutional *de facto* life sentence based upon recent Illinois decisions and his disadvantaged upbringing.

¶ 30   This appeal followed.

¶ 31                                    ANALYSIS

¶ 32   Petitioner alleges that the circuit court erred in summarily dismissing his postconviction petition. Petitioner argues that he raised two claims that had at least an arguable factual and legal basis: first, that his trial counsel was ineffective for failing to investigate his testimony before advising him to waive his right to testify, and second, that his 47-year aggregate sentence is an unconstitutional *de facto* life sentence. He asks that we vacate the court's summary dismissal and remand this matter for second-stage proceedings.

¶ 33   The Act allows a petitioner to challenge a conviction or sentence for violations of federal or state constitutional rights. *People v. Pendleton*, 223 Ill. 2d 458, 471 (2006). An action for postconviction relief is a collateral proceeding rather than an appeal from the underlying judgment. *People v. Williams*, 186 Ill. 2d 55, 62 (1999). Principles of *res judicata* and waiver will limit the range of issues available to a postconviction petitioner " 'to constitutional matters which have not been, and could not have been, previously adjudicated.' " *People v. Scott*, 194 Ill. 2d 268, 273-74 (2000) (quoting *People v. Winsett*, 153 Ill. 2d 335, 346 (1992)). Accordingly, rulings on issues that were previously raised at trial or on direct appeal are *res judicata,* and issues that could have been raised in the earlier proceedings, but were not, will ordinarily be deemed waived. *Id.* at 274; 725 ILCS 5/122-3 (West 2016).

¶ 34    In a noncapital case, postconviction proceedings contain three stages. *People v. Tate*, 2012 IL 112214, ¶ 9.  At the first stage, the circuit court must independently review the petition, taking the allegations as true, and determine whether the petition is frivolous or is patently without merit. *Id.* (quoting *People v. Hodges,* 234 Ill. 2d 1, 10 (2009) (quoting 725 ILCS 5/122–2.1(a)(2) (West 2006))).  A petition may be summarily dismissed as frivolous or patently without merit only if the petition has no arguable basis either in law or in fact.  *Id.*  Since petitioners with little legal knowledge typically draft most petitions at the first stage, "the threshold for survival [is] low.  *Id.*

¶ 35    The *Hodges* court, however, explained that its recognition of a low threshold at this stage "does not mean that a *pro se* petitioner is excused from providing any factual detail at all surrounding the alleged constitutional violation."  *Hodges*, 234 Ill. 2d at 10.  To the contrary, section 122-2 of the Act provides that a petition "shall have attached thereto affidavits, records, or other evidence supporting its allegations or shall state why the same are not attached."  725 ILCS 5/122-2 (West 2016).  The failure to either attach the necessary "affidavits, records, or other evidence" or explain their absence is fatal to a postconviction petition, and this failure "by itself" justifies the petition's summary dismissal.  *People v. Collins*, 202 Ill. 2d 59, 66 (2002).  We review the circuit court's summary dismissal of a postconviction petition *de novo*.  *Id.*

¶ 36                            Trial Counsel's Performance

¶ 37    Petitioner first contends that his trial counsel was constitutionally ineffective for failing to investigate his intended testimony before advising him to waive his right to testify.  Petitioner notes that, although he wanted to testify, he "acquiesced to his attorney's uninformed advice and declined to testify."  Petitioner reasons that his trial attorney's failure to learn about his testimony before advising him to waive his right to testify arguably constituted ineffective assistance. Petitioner adds that he was arguably prejudiced by counsel's failure to investigate, positing that,

had he testified, there is a reasonable probability that the jury would have believed him over the State's "slim evidence" and found him not guilty of either the aggravated criminal sexual assault charge, the attempted murder charge, or both.

¶ 38     Claims of ineffective assistance of counsel are governed by the familiar standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), and adopted by the supreme court in *People v. Albanese*, 104 Ill. 2d 504 (1984).  *People v. Petrenko*, 237 Ill. 2d 490, 496 (2010).  To establish ineffective assistance, a petitioner must show both that (1) counsel's performance was deficient and (2) the deficient performance prejudiced the petitioner.  *Id.*  Applied to a first-stage postconviction petition, "a petition alleging ineffective assistance may *not* be summarily dismissed if (i) it is *arguable* that counsel's performance fell below an objective standard of reasonableness and (ii) it is *arguable* that the defendant was prejudiced."  (Emphases added.)  *Hodges*, 234 Ill. 2d at 16-17.  Deficient performance is performance that is objectively unreasonable under prevailing professional norms, and prejudice is found where there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Petrenko*, 237 Ill. 2d at 496-97; *Strickland*, 466 U.S. at 690, 694.  The failure to establish either prong of the *Strickland* test is fatal to the claim.  *People v. Clendenin*, 238 Ill. 2d 302, 317-18 (2010) (citing *Strickland*, 466 U.S. at 697).

¶ 39     Matters of trial strategy, however, are generally immune from claims of ineffective assistance of counsel except where the trial strategy results in no meaningful adversarial testing.  *People v. West*, 187 Ill. 2d 418, 432-33 (1999).  In other words, the effective assistance of counsel merely refers to "competent, not perfect," representation.  *People v. Stewart*, 104 Ill. 2d 463, 491-92 (1984).  Thus, mistakes in trial strategy, tactics, or judgment will not "of themselves" render a trial counsel's representation constitutionally defective.  *Id.*  For these reasons, we must be highly

deferential to trial counsel as to trial strategy, and we must evaluate counsel's performance from her perspective at the time and not "through the lens of hindsight." *Id.*

¶ 40    It is well established, however, that a criminal defendant's decision whether to testify at his own trial is a fundamental right, and this decision is thus not a strategic or tactical matter best left to trial counsel. *People v. Daniels*, 230 Ill. App. 3d 527, 535 (1992). Nonetheless, trial counsel's advice not to testify is a matter of trial strategy and will not constitute ineffective assistance of counsel absent evidence suggesting that counsel "refused to allow [the petitioner] to testify." *People v. Youngblood*, 389 Ill. App. 3d 209, 217 (2009).

¶ 41    In addition, trial counsel has a duty to make either reasonable investigations or a reasonable decision that makes a particular investigation unnecessary. *Strickland*, 466 U.S. at 691. Therefore, in any claim of ineffectiveness, trial counsel's decision not to investigate must be examined for its reasonableness under all the circumstances of the case, "applying a heavy measure of deference to counsel's judgments." *Id.*

¶ 42    In this case, taking petitioner's allegations as true, as we must (*Tate*, 2012 IL 112214, ¶ 9), his petition reveals that counsel merely advised petitioner against testifying, which was within the scope of counsel's representation (see, *e.g.*, *Youngblood*, 389 Ill. App. 3d at 217 (observing that the decision whether to testify on one's own behalf belongs to the defendant but that the decision should be made with the advice of counsel)). In particular, "counsel is free to urge his professional opinion on his client [citation], *and if the client acquiesces in his counsel's conduct in this regard he should be bound by such action*." (Emphasis added.) *People v. Knox*, 58 Ill. App. 3d 761, 767 (1978). Petitioner's statement that he "acquiesced" to his trial counsel's recommendation are plainly indicative of advice of counsel and not a usurpation of petitioner's right. Petitioner does not allege that counsel prevented him from testifying, nor does he claim that he did not know he

had a right to testify. Further, he also does not claim—nor does the record reveal—that he made a contemporaneous assertion of his right to testify when the defense presented its case. *People v. Enis*, 194 Ill. 2d 361, 399 (2000) (holding that the defendant "acquiesced in counsel's view that defendant should not take the stand" when he failed to assert this right upon learning at trial that he would not be called as a witness). Finally, the circuit court admonished petitioner of his right to testify, which he knowingly waived.

¶ 43    In addition, the substance of petitioner's proposed testimony, in addition to a general denial, would have been that he believed J.M. accused him of rape because she still wanted to be in a relationship with petitioner and was jealous that he had ongoing sexual relationships with other women. This evidence, however, was substantially presented to the jury when it heard of her various letters to petitioner in which she wrote that she still loved and missed petitioner and that "she was 'damn sure not gonna play 2nd to no bitch!' " *Banner*, 2015 IL App (1st) 132974-U, ¶¶ 22-23. Ineffective assistance of counsel does not arise from a failure to present cumulative evidence. See *People v. Dupree*, 2018 IL 122307, ¶ 51. Petitioner thus failed to make an arguable claim that counsel's performance was deficient in advising him not to testify.

¶ 44    Moreover, even assuming that petitioner's claim met the first prong of the *Strickland* test, it did not meet the second. As we noted in his direct appeal, there was "ample" evidence to support his convictions. *Banner*, 2015 IL App (1st) 132974-U, ¶¶ 42. First, regarding the sexual assault conviction, the jury heard J.M. identify petitioner as her attacker (an accusation she never sought to recant), and J.M.'s recounting of the attack was consistent—J.M. notably refused to agree that what happened in the bathroom was sex: she clearly stated that it was rape. With respect to the attempted murder of Brown, J.M. again stated unequivocally that petitioner shot "at" Brown. This testimony was further corroborated by Darby-Jones's testimony that, although she did not see

exactly where Brown was, petitioner shot in Brown's direction. Finally, Brown testified that he saw petitioner remove the gun from his book bag and point the weapon at him before Brown turned and fled. Brown did not actually see petitioner fire the gun at him but testified that the shots came from behind him and that they were close to him. Therefore, in light of this evidence, it is not even arguable that there is a reasonable probability the outcome of petitioner's trial would have changed had petitioner testified as proposed in his affidavit. Petitioner cannot arguably meet both prongs of the *Strickland* test, so his ineffective assistance claim necessarily fails. *Clendenin*, 238 Ill. 2d at 317-18. The circuit court therefore did not err in summarily dismissing his postconviction petition with respect to this claim.

¶ 45                                  Petitioner's Sentence

¶ 46    Petitioner next argues that the circuit court was prohibited from considering the transient signature qualities of [petitioner's] youth and rehabilitative potential." Petitioner states that his petition raised an arguable claim that his mandatory minimum 47-year sentence was an unconstitutional *de facto* life sentence due to the "convergence" of statutorily mandated firearm enhancements, consecutive sentencing, and truth-in-sentencing provisions. Petitioner asserts that he raised an arguable basis of a constitutional claim based upon the "evolving neuroscientific research and consensus on young adult brain development, as well as the flux in the law" as to what extent the reasoning of *Miller v. Alabama*, 567 U.S. 460 (2012), applies to individuals over the age of 18. He asks that we remand this cause for further postconviction proceedings.

¶ 47    Petitioner first contends that *Miller*, which held that the Eighth Amendment prohibited mandatory life sentences for offenders under the age of 18, should nonetheless extend to young adult offenders such as himself. Petitioner argues that the circuit court should not have imposed a 47-year "*de facto* life sentence" on him without considering various "youth-related factors."

¶ 48    Petitioner's claim is unavailing. *Miller* explicitly held that the Eighth Amendment only prohibits "mandatory life without parole *for those under the age of 18*" at the time of their crimes. (Emphasis added.)  *Miller*, 567 U.S. at 465.  Our supreme court later observed that, when the United States Supreme Court held that 18 would be the age to differentiate between juvenile and adult offenders, it was not "based primarily on scientific research" and merely coincided with the point where society determines adulthood and childhood for many other purposes.  *People v. Harris*, 2018 IL 121932, ¶ 60 (citing *Roper v. Simmons*, 543 U.S. 551, 574 (2005)).  The *Harris* court further noted that new research findings still did not alter that "traditional line."  *Id.*  The court then expressed agreement with those courts that had repeatedly rejected this claim and held that the age of 18 still marked the line between juveniles and adults for sentencing purposes. *Id.* ¶ 61.  Petitioner would clearly wish to change where that line is drawn but doing so is best left to the legislature.  See generally, *People v. Buffer*, 2019 IL 122327,  ¶¶ 34-35.

¶ 49    Petitioner next contends that his sentence violates the proportionate penalties clause of the Illinois constitution.  This clause provides in relevant part that "All penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship."  Ill. Const. 1970, art. I, § 11.  A sentence violates the proportionate penalties clause if it is "cruel, degrading, or so wholly disproportionate to the offense as to shock the moral sense of the community."  *People v. Sharpe*, 216 Ill. 2d 481, 487 (2005) (citing *People v. Moss,* 206 Ill. 2d 503, 522 (2003)).  We may determine whether a sentence shocks the moral sense of the community by considering both objective evidence and "the community's changing standard of moral decency."  *People v. Hernandez*, 382 Ill. App. 3d 726, 727 (2008).

¶ 50    Petitioner argues that his sentence shocks the moral conscious of the community because of recent studies on adolescent brain development, various studies on prisoner life expectancy, and

petitioner's history and rehabilitative potential. Petitioner also argues that, pursuant to our supreme court's holding in *Harris*, his petition must advance for further proceedings.

¶ 51    The 18-year-old defendant in *Harris* argued on direct appeal that his 76-year sentence shocked the moral sense of the community given the facts of his case, his youth, and other mitigating circumstances. *Harris*, 2018 IL 121932, ¶ 36. The court, however, noted that there was no evidentiary hearing or factual development to support the defendant's claim in the trial court. *Id.* ¶ 46. The court thus held that the record was insufficiently developed to address his contention that *Miller* applied to his proportionate penalties claim. *Id.* ¶ 48. Nonetheless, the *Harris* court observed that the defendant could raise the claim in a postconviction petition. *Id.*

¶ 52    Here, petitioner argues that he should have the opportunity to develop the record to determine whether the protections of *Miller* can apply to a 20-year-old offender. It is well established, however, that although the threshold for a postconviction petition's survival at the first stage of proceedings is low, a *pro se* petitioner is not excused from providing any factual detail at all. *Hodges*, 234 Ill. 2d at 10. As noted above, section 122-2 of the Act requires that a petitioner either attach affidavits, records, or other evidence supporting the allegations or explain their absence. 725 ILCS 5/122-2 (West 2016). There is nothing attached to petitioner's postconviction petition to support his assertion that *his own* immaturity or circumstances support his claim that his sentence is an unconstitutional *de facto* life sentence. Instead, his petition (but not his affidavit) merely contains general assertions that immaturity and brain development commonly associated with juveniles can also extend into young adulthood. Petitioner's recitation of various general studies regarding the evolving science of juvenile maturity and development is insufficient to survive the requirement that his petition must have some factual detail (in the form of affidavits or other evidence) in support of his claim. *Hodges*, 234 Ill. 2d at 10.

¶ 53    In addition, while he makes various claims in his petition that he had a troubled childhood, these claims do not appear in his affidavit, nor are there any affidavits, records, or other evidence that would provide support for this contention. The purpose of section 122-2's requirement of attaching "affidavits, records, or other evidence" to a postconviction petition is that it "shows that the verified allegations are capable of objective or independent corroboration." *Collins*, 202 Ill. 2d at 67. As noted above, this failure by itself justifies the petition's summary dismissal. *Id.* at 66. The circuit court therefore did not err in summarily dismissing his petition at the first stage.

¶ 54    Finally, petitioner's reliance upon *People v. House*, 2015 IL App (1st) 110580-B, *appeal allowed*, No. 125124 (Jan. 29, 2020), is unavailing. In that case, another division of this court affirmed the circuit court's granting of the State's motion to dismiss at the second stage of proceedings, but nonetheless remanded the matter for a new sentencing hearing. *Id.* ¶¶ 23, 77. The court held that the defendant's mandatory life sentence (following a conviction for murder by accountability) violated the proportionate penalties clause, where the defendant was 19 years old at the time of the offense, had no prior violent criminal history, and was minimally culpable since he acted solely as a lookout. *Id.* ¶¶ 46, 64. Notably, the *House* court stated that the defendant's 1993 conviction under an accountability theory "weighed heavily in our conclusion that his mandatory natural life sentence shocked the moral conscience of the community." *Id.* ¶ 32. The court further observed that, although the defendant received a mandatory natural life sentence, the 17-year-old codefendant, who "either fired the gun at the victims or struck them with the gun," was sentenced to 44 years' imprisonment with day-for-day good conduct credit and released in April 2018. *Id.* ¶¶ 35-36.

¶ 55    Here, petitioner was not convicted based upon mere accountability: petitioner placed a gun against J.M.'s chin while she was holding her and petitioner's infant son, forced her into an upstairs

bathroom, raped her, and then later slapped her when she had the temerity to laugh at his attempt to blame her for both "messing up his life" and his criminal record. J.M. also identified petitioner as her attacker, never recanted her accusation, and was consistent in recounting the attack and characterizing it as rape and not sex. As to the attempted murder conviction, J.M. testified that petitioner shot "at" Brown, Darby-Jones testified that petitioner shot in Brown's direction, and Brown testified that he saw petitioner point the gun at him before he fled. Brown further stated that the shots came from behind him and were close to him.

¶ 56    Finally, we note that *House* involved a second-stage dismissal following the appointment of counsel and the amendment of the defendant's petition, which included a witness's affidavit and other "newly discovered evidence of police misconduct." *House*, 2015 IL App (1st) 110580-B, ¶¶ 23, 34. This case concerns proceedings at the first stage and lacked evidentiary support, which alone can justify summary dismissal. *Hodges*, 234 Ill. 2d at 10; *Collins*, 202 Ill. 2d at 66. Consequently, *House* is distinguishable, and we cannot hold that petitioner's sentence shocks the moral sense of the community. Petitioner therefore cannot make an arguable claim that his minimum 47-year sentence is an unconstitutional *de facto* life sentence.

¶ 57                                  CONCLUSION

¶ 58    Petitioner's trial counsel did not render ineffective assistance for allegedly failing to investigate petitioner's proposed testimony prior to advising him not to testify. In addition, petitioner's 47-year aggregate sentence is not an unconstitutional *de facto* life sentence. The circuit court thus did not err in summarily dismissing petitioner's petition for postconviction relief.

¶ 59    Affirmed.